UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JENNIFER L. EASTMAN,<br><br>                    Plaintiff,<br><br>          vs.<br><br>NANCY A. BERRYHILL,[1]<br>Deputy Commissioner for Operations,<br>performing the duties and functions<br>not reserved to the Commissioner of<br>Social Security,<br><br>                    Defendant. | 4:17-CV-04124-LLP<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff, Jennifer L. Eastman, seeks judicial review of the

Commissioner's final decision denying her application for supplemental

security income disability ("SSI") benefits under Title XVI of the Social Security

Act.[2]

_____

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security.  The revised title is necessary until the President appoints another executive to serve as Acting Commissioner, or there is a nominee for the position of Commissioner of Social Security, at which time the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3346(a)(2), would allow Nancy Berryhill to resume the position of Acting Commissioner of Social Security while the nomination is pending.

[2] "Title XVI" benefits are sometimes called SSI benefits, and "Title II" benefits are sometimes called SSD/DIB benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB/Title II benefits is dependent upon one's

Ms. Eastman has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits.  <u>See</u> Docket No. 13.  Alternatively, Ms. Eastman requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g).  This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS[3]

### A.    Statement of the Case

This action arises from plaintiff, Jennifer J. Eastman's, application for SSI filed on February 13, 2014, alleging disability since January 4, 2013, due

---

"coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI/Title XVI benefits, but the potential amount of SSI/Title XVI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  <u>See</u> <u>e.g.</u> 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI respectively).  In this case, Ms. Eastman filed her application for Title XVI (aka SSI) benefits only.  AR335, 363, 380-81.

[3] The following is taken from the parties' joint statement of material facts.  (See Docket No. 12), with minor changes by the court such as the removal of paragraph numbers and altering punctuation.

to PTSD, anxiety, panic attacks, depression, learning disability, neurological muscle spasm disorder, with spasms in her back and hips, and degenerative disc disease.  AR335, 363, 380-81.

Ms. Eastman's claim was denied initially and upon reconsideration. AR268, 276.  Ms. Eastman then requested an administrative hearing.  AR283.

Ms. Eastman's administrative law judge (ALJ) hearing was held on May 17, 2016, by Brenda Rosten.  AR202.  Ms. Eastman was represented by other counsel at the hearing and an unfavorable decision was issued on August 16, 2016.  AR10.  Plaintiff's current counsel then appeared to appeal her hearing-level denial.  AR333.

At step one of the evaluation, the ALJ found that Ms. Eastman had not engaged in substantial gainful activity ("SGA") since the date of her SSI application, February 13, 2014.  AR15.

At step two, the ALJ found that Ms. Eastman had severe impairments of mild degenerative disc disease of the cervical spine and lumbar spine, osteopenia of the left knee, affective disorder and anxiety disorder.  AR15.

The ALJ also found that Ms. Eastman had medically determinable impairments of thyroid cancer, left trapezius strain and cellulitis, which were found non-severe impairments. AR16.

The ALJ also stated that there were references in the record to an intellectual/learning disability, but found that it did not represent a medically determinable impairment as there was no definitive diagnosis of this condition or an indication of a cognitive defect in the record.  AR16.

3

The ALJ also stated in the decision, "that the claimant's alleged intellectual disability does not meet the requirements of medical listing 12.05, as there is no evidence of deficits in adaptive functioning before age 22. The claimant reported that she was in special education and had difficulties in math and reading. This is consistent with the claimant's educational records, which show a full scale IQ of 64 and a grade point average of 2.7 (Exhibit 15E/3). However, the claimant testified that she graduated high school and had a driver's license. She also reported that she could read the newspaper to some extent. The claimant also worked for the post office at substantial gainful activity levels prior to the alleged onset date. The undersigned notes that although the claimant's intellectual disability is a non-medically determinable impairment in this record, her alleged limitations fall within the very simple, unskilled work that is set out in the residual functional capacity below." AR16-17.

The ALJ found that Ms. Eastman did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart B, App 1 (20 CFR §§ 416.920(d), 416.925, and 416.926) (hereinafter referred to as the "Listings"). AR17. The ALJ found that Ms. Eastman had mild limitations in activities of daily living, moderate limitations in social functioning, and moderate difficulties with concentration, persistence or pace. AR18. The ALJ noted a short-term psychiatric hospital stay, but no episodes of decompensation of extended duration. AR18.

4

The ALJ determined that Ms. Eastman had the residual functional capacity ("RFC") to perform:

> A range of light work as defined in 20 CFR 416.967(b). Specifically, she can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit for about 6 hours in an 8-hour workday, and stand and/or walk combined about 6 hours in an 8-hour workday. She should never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch and crawl. The claimant should have no more than occasional work around hazards (such as unprotected heights and fast and dangerous moving machinery). Mentally, the claimant is limited to simple tasks. She is able to maintain concentration, persistence, and pace for two-hour segments. She can respond appropriately to brief and superficial interactions with the general public.

AR19.

The ALJ's credibility finding regarding Ms. Eastman's statements concerning the intensity, persistence and limiting effects of her symptoms was that they were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR20.

The ALJ considered the opinions of the state agency psychological consultants who determined that Ms. Eastman could understand, remember, and carry out two-step instructions on a consistent basis, and could sustain a basic level of attention and concentration for two-hour segments if she was in a routine work environment and that Ms. Eastman would require reduced contact with the public, was not capable of working in a crowd of people, and she would require a routine work environment but was capable of responding appropriately to basic changes in the work setting, if it was routine. AR24.

The ALJ gave the opinions "considerable weight" because their assessments were consistent with the record as a whole, specifically that over time Ms. Eastman's symptoms improved with medication and counseling and she was capable of maintaining activities of daily living and some outside activity, citing Exhibit 20F/1.  AR24.

The ALJ considered the third-party statement completed by Ms. Eastman's husband and stated that she "accepts" his observations, but gave them little weight, asserting that they were based on casual observations and not objective medical testing or clinical observations.  AR24-25.

The ALJ considered the psychological report prepared by psychologist, Mary Honer, Ed.D, in 1993, and noted that the report reflected that Ms. Eastman had a full scale IQ of 64, and that she had been in special education since elementary school, but gave the opinion "little weight" acknowledging that it supported "some type of intellectual or learning disability" but asserted it was not consistent with Ms. Eastman's work and tasks as an adult, that it did not contain a specific diagnosis and it was prepared for school purposes.  AR25.

The ALJ stated the RFC was based on the treatment record, Ms. Eastman's testimony, and her reported activities of daily living, and given Ms. Eastman's degenerative disc disease and osteopenia the ALJ stated "the undersigned has limited her to a light exertional level, with occasional postural limitations" and height and hazard restrictions were incorporated into the RFC due to Ms. Eastman's reported dizziness due to her medications.  AR25.

6

The ALJ stated that due to Ms. Eastman's mental limitations, she limited her to simple tasks for which she could maintain her concentration, persistence and pace for two-hour segments and to only brief and superficial interactions with the public.  AR25.

Based on the RFC determined by the ALJ, the ALJ first found that Ms. Eastman was capable of performing past relevant work as a Mail Processing Clerk (AR25), but then stated in the explanation section that Ms. Eastman "cannot" perform her past work as a Mail Processing Clerk. AR26.  The ALJ found that Ms. Eastman was not disabled at step 4.  AR26.

Ms. Eastman timely requested review by the Appeals Council (AR333), and submitted additional new and material evidence after notifying the Appeals Council that the record had not been fully developed (AR442), consisting of:

a.    Medical records from Sanford – Physical Medicine and Rehabilitation Clinic for March 7, 2012, to April 26, 2016.  See AR65-199.

b.    Medical records from Sanford – Family Medicine Clinic for March 6, 2015, to May 10, 2016.  See AR42-64.

c.    Medical records from AMG Midwest Psychiatric Clinic for January 12, 2016, to June 27, 2016.  See AR32-42.

The Appeals Council acknowledged receiving the evidence submitted by Ms. Eastman, but stated that it did not consider and exhibit the evidence because it found the "evidence does not show a reasonable probability that it would change the outcome of the decision."  AR2.

7

The Appeals Council denied Ms. Eastman's request for review making the ALJ's decision the final decision of the Commissioner.  AR1.  Ms. Eastman then timely filed this action.

## B.    Plaintiff's Age, Education and Work Experience

Ms. Eastman was born in October of 1976, and completed the 12th grade in 1995 with attendance in special education classes from kindergarten to the 12th grade at Bolsa School in California.  AR335, 364.

The appeal record contained Ms. Eastman's high school transcript that included a psychological report with Wechsler IQ testing performed in 1987 and 1993.  AR432.  The report indicated that IQ testing administered in 1987 revealed a VIQ or verbal IQ of 57, and a PIQ or performance IQ of 89, and that upon retesting in 1993 the VIQ was 54, PIQ was 80 and full scale IQ was 64.  AR432.  The transcript indicated a 2.7 GPA, and that she had "MET D/STD" proficiency standards in reading, mathematics, and English, but many of the listed classes included the designation "SE" or special education following the class name.  AR430.  The report indicated that Ms. Eastman had been in special education classes since elementary school and was only mainstreamed for physical education.  AR433.  The psychologist stated that Ms. Eastman's cognitive ability was in the overall deficient range with verbal scores significantly lower than performance scores suggesting a communication handicap, and her greatest weakness involved auditory processing, receptive and expressive language and memory.  AR433.  Ms. Eastman's Individualized Education Program (IEP) stated that she met the Title 5 eligibility due to a

learning disorder.  AR435.  The IEP stated that her proficiency tests in math, reading, and English would be given with no time limits, in a small classroom setting, and with needed assistance given because regular testing exceeded her current level of functioning.  AR435.  The transcript also contained scores from Wide Range Achievement Testing, and Woodcock-Johnson Testing, which were consistent with the intellectual impairment shown in the IQ test results.  AR432.

The ALJ identified Ms. Eastman's past relevant work as a mail processing clerk, Dictionary of Occupational Titles (DOT) # 209.687-026.  AR26.

## C.    Relevant Medical Evidence

### 1.    Sanford Family Medicine

Ms. Eastman was seen at the Sanford Family Medicine Clinic on May 5, 2013, for muscle spasms in her neck, back and shoulder and her assessments included trapezius muscle strain, stress and adjustment disorder, and anxiety reaction.  AR466.  Citalopram was prescribed for her dysthymia symptoms and counseling was encouraged.  AR467.  She was seen again on June 28, 2013, with continued neck and shoulder symptoms for which she had been receiving physical therapy.  AR473.  An exam revealed cervical tenderness with an x-ray showing straightening of the cervical spine and mild degenerative changes, and flexeril was prescribed.  AR473-74, 478, 839-40.  Ms. Eastman received five physical therapy sessions from May 23, 2013, to June 7, 2013, for neck/shoulder pain.  AR606.  Continued therapy was recommended and

9

completed through 10 sessions when further therapy was again recommended due to ongoing pain and limitations.  AR606, 613, 636-37.

Ms. Eastman was seen on January 3, 2014, for anxiety (following an emergency room visit on Christmas day), which she had been dealing with since she had a dilation and curettage (D&C) procedure for a miscarriage and the uterine artery was cut and she nearly bled out.  AR493.  She ended up having an emergency hysterectomy.  AR493.  Ms. Eastman also complained of ongoing back pain.  AR493.  She had been on a number of anxiety medications for short periods and had started counseling following the emergency room visit.  AR493.  The doctor thought her back symptoms may be related to stress and prescribed valium pending an appointment with psychiatry.  AR496.

Ms. Eastman was seen on April 2, 2014, for neck pain with tingling and spasms in her left shoulder.  AR765.  Following examination, a cervical spine MRI was ordered which revealed some mild disc protrusion without spinal stenosis. AR764-65.

Ms. Eastman was seen on August 19, 2014, for chronic neck and hip pain.  AR702.  Voltaren was prescribed for pain and behavioral health was involved to help with her chronic pain and long-term goals of functioning and maximum pain relief.  AR702.

Ms. Eastman reported on August 22, 2014, that the Voltaren prescribed for her neck pain was not helping, and she had been to the emergency room due to dizziness, headache and neck pain; Ultram was prescribed.  AR696-97.

10

Ms. Eastman was seen on September 2, 2014, for follow-up for chronic pain including headaches, back and neck pain. AR694. Examination revealed diffuse paraspinous muscle tenderness, stiffness was apparent, and range of motion limited with pain. AR694. Her left leg was also noted to be one inch shorter than her right. AR694.

Ms. Eastman contacted the clinic on September 15, 2014, and received an orthopedic referral for her hip pain. AR690.

### 2. Sanford Family Medicine Clinic Records Submitted to the Appeals Council

Ms. Eastman was seen on March 6, 2015, for a 60-pound increase in her weight and fatigue and depression. AR43. Her assessments at that time were obesity, major depressive disorder, panic disorder with agoraphobia and moderate panic attacks, PTSD, and tachycardia. AR43.

Ms. Eastman was seen on March 30, 2015, with neck and face swelling and tenderness. AR45.

Ms. Eastman was seen on June 5, 2015, to follow-up on an emergency room visit for cellulitis of the right arm. AR47.

Ms. Eastman was seen on February 5, 2016, complaining of worsening problems with her memory. AR50. She reported that she had problems learning since she was a child and she graduated high school, but was told she was at the fifth grade level. AR50. She said she had worked at numerous jobs, but could never keep her job very long because she couldn't keep up. AR50.

11

The doctor felt her memory problems were more related to her anxiety and problems learning but did refer her for neuro psychiatric testing.  AR50.

Ms. Eastman was seen on March 30, 2016, again to follow-up on an emergency room visit for cellulitis of the left shoulder.  AR53.

### 3.    Sanford Physical Medicine & Rehabilitation Clinic Records Submitted to Appeal Council

Ms. Eastman was seen on March 3, 2012, for bilateral numbness, tingling and swelling in the upper extremities, which she believed was due to repetitious activity at her post office job and was diagnosed with arm pain and carpal tunnel of the right wrist based on nerve conduction studies.  AR70-71, 76, 804.

Ms. Eastman was seen on April 30, 2014, for an initial consultation regarding neck and upper back pain, which had persisted for over one year with physical therapy, chiropractic, and clonazepam treatments.  AR80-81. Examination revealed tenderness in the cervical paraspinal muscles.  AR81.  A cervical spine MRI obtained on April 8, 2014, was reviewed and revealed left C4-5 disc protrusion with mild neuroforaminal stenosis, C5-6 disc bulge, and straightening of the cervical lordosis, as well as thyroid nodule.  AR81, 831-32. Trigger point injections were administered.  AR81, 757.  On June 2, 2014, Ms. Eastman reported that the TPI was wearing off and she had the same pain as before.  AR93, 716.

On June 19, 2014, Ms. Eastman contacted the clinic again and reported that her neck pain was terrible again; she couldn't lie down and had terrible

muscle spasms.  AR97, 715.  Ms. Eastman was late for her appointment the next day and could not be rescheduled until July 8, 2014, for another injection.  AR98-99.  Ms. Eastman contacted the clinic again on June 23, 2014, and reported she couldn't take her neck pain much longer, and was scheduled to start radiation treatment so she wanted an injection for her neck before the radiation treatment, but her doctor was out of town so an injection could not be done.  AR100, 714.

Ms. Eastman was seen on June 24, 2014, for her ongoing neck pain and received trigger point injections again.  AR102, 710.  She also received chiropractic treatment for her neck from July 31, 2014, to August 21, 2014.  AR664-671.

Ms. Eastman was seen on November 3, 2014, for low back pain with radiation to her leg.  AR117.  Examination revealed tenderness to palpation over the lumbar paraspinal muscles, and limited range of motion in flexion and extension.  AR118.  A lumbar MRI revealed an L5-S1 annular tear without obvious nerve root impingement.  AR118.  An epidural steroid injection was administered at L5-S1, and physical therapy prescribed.  AR118, 136. Ms. Eastman reported on November 25, 2014, that the injection helped 100% with her hips, but was still getting occasional left leg pain and had pressure in her back.  AR138.  She also asked about other possible treatment for her neck. AR138. However, on December 17, 2014, Ms. Eastman reported that her pain had not improved much since the injection and she was having more back pain than hip pain, and was having leg pain also.  AR139.

13

When seen on November 11, 2014, for a lumbar epidural injection due to back and left leg pain, the physical exam note included "Mental Status: normal." AR946, 948.

On November 19, 2014, Mark Ponstein, a physical therapist saw Ms. Eastman for therapy due to left knee pain and stated that Ms. Eastman did not have an antalgic gait, but noted she had a slightly externally-rotated gait pattern. AR982, 983. Ms. Eastman rated her left knee pain on average at 5-6/10. AR983. She had slight pain deep in the knee on the left and no pain on the right during resisted testing with knee extension at 0 degrees. AR983. After having her sitting posture corrected for her low back and left leg symptoms went from 3-4/10 down to 0/10. AR983. Ms. Eastman was educated on proper seated position with a lumbar roll and educated to possibly lie on her stomach more throughout the day instead of sitting in a flexed position on her bed watching TV to help her low back and left hip pain. AR984.

Ms. Eastman was seen on December 24, 2014, and reported that overall she had received about 20% relief from the epidural in her back. AR140. She continued to have low back pain with radiation to the left leg, which was worse with prolonged postures, bending and twisting, or getting out of her car, and better with rest. AR140. Examination revealed continued tenderness to palpation of the paraspinal muscles and the slump sit test caused typical pain on the left, and an additional epidural injection was planned and administered on January 13, 2015. AR141, 153, 954.

14

On January 19, 2015, Ms. Eastman contacted the clinic and reported that the epidural had helped with the nerve pain down her leg, but the back pain continued and increased. AR155. She also reported that her back had "popped out" and she feels something moving in her lower back. AR155. On March 9, 2015, Ms. Eastman reported that she just wanted to lay down all the time to make the back pain better and sitting or standing for long periods hurt her hips more. AR158.

Ms. Eastman was seen on April 15, 2015, and had continued low back pain with left sided leg pain and swelling in her legs, and she reported that the epidural had not helped AR160. Lumbar and thoracic spine MRIs were recommended. AR161.

On April 22, 2015, Edward Czarneck, M.D., stated that Ms. Eastman's lumbar MRI showed a disk desiccation and small right protrusion at L5-S1 without definite spinal stenosis or nerve root impingement. AR992. The MRI also revealed minimal disk bulging at L4-5. AR992.

Ms. Eastman was seen on April 29, 2015, following the MRIs; the thoracic MRI was unremarkable, and the lumbar MRI was unchanged showing continued L5-S1 disk abnormality. AR181. Treatment options including Lyrica, acupuncture, and a surgical consultation were discussed. AR181. On May 27, 2015, Ms. Eastman reported ongoing low back and leg pain and was having difficulty lifting Pampers and other items. AR193.

On April 12, 2016, the clinic contacted Ms. Eastman to schedule recheck and possible additional injections. AR195. Ms. Eastman returned the call and

15

reported that her last injection had been in January 2016 and she had received 0% pain relief.  AR196.  Ms. Eastman's insurance would not authorize the treatment because the last injection had not helped, and she was scheduled to see the doctor to discuss long term treatment, but missed the appointment. AR198-99.

### 4.    Sanford Orthopedics & Sports Medicine Clinic

Ms. Eastman was seen on September 16, 2014, for bilateral hip pain and reported a prior growth plate injury when she was 12 that created a leg length discrepancy and alters her gait contributing to the hip pain.  AR688.  X-rays of the hips revealed no fracture or dislocation but noted apparent leg length discrepancy, and shoe lifts and physical therapy were discussed.  AR690.

Ms. Eastman was seen on October 1, 2014, for left knee pain following an injury 9 days earlier, and an x-ray revealed no acute fracture, old healed fractures, and osteopenia; an MRI was ordered.  AR675, 678-79.  The MRI revealed a small knee effusion and ruptured popliteal cyst, edema, and slight lateral subluxation of the patella without bone contusion.  AR809.

Ms. Eastman contacted the orthopedic clinic on October 14, 2014, and requested an order for a different left knee brace than ordered by the doctor due to insurance coverage issues.  AR674.

### 5.    Sanford Surgical Associates and Sanford Endocrinology Clinic

Ms. Eastman was seen on July 15, 2014, post-surgery and one week of radiation treatment for her thyroid cancer.  AR705.  She reported fatigue and weight gain, which was felt to be related to her psychiatric medication.  AR705.

Ms. Eastman was seen on August 11, 2014, to follow-up on the thyroidectomy performed in May due to cancer.  AR703.

### 6.    Sanford Hospital

Ms. Eastman was discharged from physical therapy for a trapezius strain following 14 sessions of therapy on July 10, 2013.  AR790-91.  At discharge she reported ongoing pain rated 2/10 with medication.  AR791.

Ms. Eastman was seen on December 25, 2013, at the emergency room with shortness of breath and nausea, and was diagnosed with anxiety.  AR782, 785.

Ms. Eastman was seen on April 14, 2015, in the emergency room with left leg swelling and pain.  AR1012.  Examination revealed mild left leg swelling, NVI distally and venous Doppler was obtained that was negative. AR1014, 1018.  She was told to elevate it, use ice, and follow-up with her primary care physician.  AR1014.

Ms. Eastman was hospitalized on May 28, 2014, for papillary thyroid cancer and a right thyroidectomy was performed.  AR720.

Ms. Eastman was seen on September 21, 2014, in the emergency room following an injury to her left knee two days earlier when she fell off a chair, and reported pain and swelling. AR685.  Examination revealed decreased range of motion, swelling, and tenderness in the knee, and her musculoskeletal exam also revealed edema and tenderness.  AR686.

Ms. Eastman was seen on February 11, 2015, in the emergency room for palpitations and some dizziness.  AR998.  She was treated with IV fluids,

Ativan, Toradol, and Pheregan and released feeling better. AR1003. The review of systems section of the note included "Back: no pain." AR998. She had full strength in her arms and legs. AR1001. Matthew Finke, M.D., stated her physical exam was unremarkable, her EKG and chest x-ray showed no abnormalities, and his assessment was palpitations. AR1003.

In April 2015, Courtney Merkwan, M.D., saw Ms. Eastman for lower extremity edema and pain. AR1012. He noted that she had normal motor abilities, muscle tone and strength. AR1013. The review of systems section of the note included "Musculoskeletal/Extremities: +leg swelling and pain, back pain." AR1913. A Doppler study of Ms. Eastman's left leg was normal, and Dr. Merkwan indicated that Ms. Eastman's pain was likely from her back. AR1014, 1018.

In June 2015, Ms. Eastman sought treatment for what she thought was a small bug bite or pimple on her upper arm. AR1021. She said she had been "working out in the garage painting for the last 2 days . . . ." AR1021. Kristen Busse, M.D., diagnosed cellulitis and also observed Ms. Eastman had a normal mood, affect, behavior, judgment, and thought content. AR1025.

In March 2016, Matthew Finke, M.D., saw Ms. Eastman at the emergency room for complaints of shoulder pain after she had a tetanus immunization. AR1033. He diagnosed cellulitis, and also noted that she had 5/5 strength in her arms and legs. AR1032-33.

18

7.    **Sanford Psychiatry and Behavioral Health Records**

Ms. Eastman was referred for therapy due to issues with PTSD and anxiety and reported to her therapist on December 24, 2013, that she lived with her spouse and four children, ages 17, 14, 11, and 5. AR524. She had a twin sister to whom she was close. AR524.

Ms. Eastman was seen on January 17, 2014, for psychiatric evaluation and reported that she had previously been in the hospital for a dilation and evacuation (D&E) procedure for fetal demise at 16 weeks gestation, and in the recovery room had experienced severe bleeding, apparently due to a nick in the major artery, and had been rushed back into surgery for an emergency hysterectomy thinking she was going to die. AR777. She explained she lost the fetus and the chance to have another baby both and had been depressed and dysphoric since that time. AR777. Ms. Eastman's GAF was assessed at 40 to 45, and Cymbalta was prescribed along with valium and counseling. AR778. When she was seen a week later she reported she was already feeling less depressed, functioning a little better, and having less anxiety. AR774.

Ms. Eastman was seen on January 29, 2014, for counseling and reported attending a friend's funeral and having a panic attack, and that she continued to have pain with her anxiety. AR773. She reported she was considering filing for disability, and her counselor stated she supported Ms. Eastman filing for disability given her circumstances. AR773.

Ms. Eastman was seen on February 26, 2014, for a psychiatric visit and reported improved sleep, depression, and less crying, but afternoon

19

anxiousness, off and on irritability, flashback nightmares, and she was forgetful and having memory lapses.  AR770.  She was observed to be slightly psychomotor slowed, and valium in the afternoon was added to her medications.  AR770.

Ms. Eastman was seen on March 11, 2014, for counseling and reported that she continued to do a bit better, but still struggled with nightmares at times, continued to avoid crowds, and filed for disability.  AR768. Ms. Eastman stated she was beading some bookmarks and that this helped her focus.  She was looking forward to a visit from her father.  AR768.

Ms. Eastman was seen on March 26, 2014, for a psychiatric visit and reported that her sleep was better, memory was slowly improving, family interactions were slowly getting better, energy level was fair, was not having mood swings or racing thoughts, but was irritable at times, and having episodic sadness and mourning.  AR767.  She also reported shooting neuropathic-sounding pain in her neck and shoulders, and was observed to be moving a little slowly due to the pain.  AR767.  Ms. Eastman was continuing twice weekly counseling sessions.  AR767.

Ms. Eastman was seen on April 22, 2014, for a psychiatric visit and was tearful when discussing the surgical event that resulted in an emergency hysterectomy, and also mentioned her neck pain and the nodules which had been found in her thyroid.  AR761-62.

Ms. Eastman was seen on May 27, 2014, for a psychiatric visit and counseling and reported feeling better since Wellbutrin had been prescribed.

20

AR730-32. She reported that she felt Cymbalta was working well for her, but mirtazapine was causing weight gain, and clonazepam was working well for her with fewer less intense panic attacks. AR762.

Ms. Eastman was seen on June 30, 2014, for a psychiatric visit and counseling and her medications were continued unchanged. AR709. She presented as being quite anxious in counseling and was having trouble sleeping. AR709.

Ms. Eastman was seen on September 8, 2014, and reported fatigue secondary to thyroid surgery, chronic neck pain, feeling like isolating and not wanting to get out of bed, feeling overwhelmed, and was having nightmares from the event resulting in her PTSD in January 2014. AR690-91. Prazosin was prescribed for her nightmares, and Wellbutrin continued, but not increased secondary to her thyroid condition. AR691. Ms. Eastman was also seen that day for counseling, and reported that her functioning had declined, she was tearful, having difficulty getting up in the morning and was feeling pain all the time. AR693. The counselor felt Ms. Eastman may require at least a partial hospitalization due to her mental health decline. AR693.

Ms. Eastman was seen for counseling on September 30, 2014, due to anxiety, depression, and PTSD. AR680. Ms. Eastman had been to Avera and had started the partial hospitalization program, but had not participated very long because she became overwhelmed. AR680. She had been receiving radiation for cancer and was scheduled for more in January. AR680. She reported her church was supportive and she had friends coming over on a

21

regular basis to check on her.  AR680.  She also connected with the American Cancer Society, which was providing some support.  AR680.

Ms. Eastman was seen on October 10, 2014, and reported increased anxiety, feeling overwhelmed, and having difficulty sleeping; Hydroxyzine was prescribed.  AR675.

### 8.    AMG Midwest Psychiatry Clinic

Ms. Eastman was seen on January 19, 2015, for an intake evaluation for depression and anxiety.  AR1111-12.  Her symptoms included low energy, depressed mood, anhedonia, irritability, fluctuating sleep, crying spells, poor concentration, and suicidal ideation without a plan or intent.  AR1112.  Tony Sorensen, Psy.D., stated that Ms. Eastman was oriented, had intact memory, and an age appropriate fund of knowledge.  AR1111.  Her thoughts were logical, she had intact computation and abstract reasoning.  AR1111.
Dr. Sorensen estimated that she had average intelligence. AR1112.  Her mental status exam also revealed restricted affect and depressed mood.  AR1112-13.
She was taking Wellbutrin, clonazepam, and hydroxyzine.  AR1112.
Dr. Sorensen recommended at least weekly therapy and medication.  AR1113.
Ms. Eastman began psychotherapy and had counseling on January 22, 2015, and January 29, 2015, with similar symptoms and exam.  AR1107, 1110.

Ms. Eastman was seen for a psychiatric visit on February 5, 2015, and had transferred care to the Avera clinic because Avera was paying her medical expenses and they encouraged her to utilize Avera providers.  AR1099.

Ms. Eastman reported she continued to struggle with unpredictable symptoms, some days better than others.  AR1099.  She reported her mood was down, a lack of interest, low energy, low motivation, and her anxiety was always high with episodic panic attacks and anticipatory anxiety.  AR1100.  She reported decreased and restless sleep with nightmares and that she wakes in a panic attack at least once per week.  AR1100.  She had been scheduled to start the Avera Partial Hospitalization program in September 2014, but couldn't do it as she felt she couldn't trust Avera.  AR1100.  Ms. Eastman's medications were unchanged and she was to continue with counseling and consider the partial hospitalization program at some point in the future, but not yet.  AR1105.

Ms. Eastman was seen for a psychiatric visit on March 9, 2015, and reported that her mood was down, irritable and varying from day-to-day and she had gained weight and was fatigued.  AR1088.  Her weight had increased from 160 pounds in 2013 to 196 pounds on exam.  AR1088.  She was to taper off Cymbalta and replace it with generic Prozac since she was only doing marginally on Cymbalta.  AR1091.

Ms. Eastman continued counseling sessions about weekly from January 29, 2015 through March 26, 2015, with varied but similar symptoms.  AR1082, 1084, 1086, 1093, 1095, 1097, 1107.  On March 26, 2015, she reported that she had attended a sporting event for her son but felt so overwhelmed the first day she did not attend the second day.  AR1082.

Ms. Eastman's counseling sessions continued and in the April 6, 2015, session it was noted she had been in Avera Behavioral Health for two days after

overdosing on two medications.  AR1080.  At her session on April 16, 2015,
Ms. Eastman wanted to write a letter to the physicians who had performed her
D&E procedure, but was frustrated and discussed her difficulty and
embarrassment over her difficulty writing and acknowledged she was in special
education classes for writing so the counselor wrote down her thoughts and
told her he would type them up prior to the next session.  AR1078.

Ms. Eastman was seen for a psychiatric visit on April 21, 2015, following
her hospitalization for worsening depression and anxiety, and an increase in
her medications.  AR1074.  Her mood was neutral, dysphoric, and anxious and
her affect was congruent, tearful, and downcast.  AR1076.  Her trazodone
dosage was increased, and Wellbutrin was added as an additional medication
to Prozac.  AR1076.  When seen for another psychiatric visit on May 6, 2015,
Ms. Eastman reported that the medication changes "seemed to help some' but
her mood and affect were unchanged.  AR1063, 1065.

Ms. Eastman continued weekly counseling sessions from April 28, 2015
through June 18, 2015, and had another session on September 15, 2015.
AR1047-1061, 1068-1072.  In May she mentioned that she was having
difficulty recalling things and having nightmares.  AR1068.  On June 18, 2015,
she reported that her mood had improved but was still having nightmares
several nights per week.  AR1049.

Ms. Eastman was seen for a psychiatric visit on October 13, 2015, and
reported feeling better, more stable, anxiety manageable.  AR1042. Her mood

24

was neutral and anxious, and affect was congruent with some seasonal depression. AR1045.

Ms. Eastman was seen for a psychiatric visit on January 12, 2016, and reported doing "okay" overall and said fluoxetine seemed to be working well for her mood. AR1036. She said her husband worked full time on the night shift and sometimes when she got bored, she would play bingo. AR1036. Her therapist stated that she was at low risk with an adequate support system and good coping. AR1036. Ms. Eastman's mood was neutral, affect congruent and downcast, depression screening positive, and anxiety screening indicated moderate to severe anxiety, worse this time of year. AR1039. Her Prozac was decreased due to side effects. AR1040.

Ms. Eastman was seen for a psychiatric visit on June 27, 2016, and reported doing pretty good and had traveled to see family in Utah, and had a trip planned to Hawaii that was being paid for by her twin sister's fiancé. AR32. She reported her anxiety was manageable but was taking clonazepam 2-3 times per week. AR32.

### 9.    Avera Behavioral Health Hospital

Ms. Eastman presented voluntarily on April 4, 2015, to the Avera Behavioral Health Hospital with suicidal ideation and grave deterioration in functioning, and was admitted to prevent self-harm and due to reduced functioning. AR926, 930. She reported terrible depression, decreased concentration, motivation, energy, mood and appetite. AR926. She had

25

frequent anxiety attacks throughout the day, was anxious around people, and her heart flutters becoming diaphoretic and short of breath.  AR926. Ms. Eastman reported she was more irritable and explosive and had intense thoughts of harming herself and took more than her prescribed dosage of Klonopin and hydroxyzine.  AR926.  Ms. Eastman was treated with trazodone and Prozac and responded well.  AR927.  Ms. Eastman requested discharge on April 5, 2015, even though inpatient hospitalization was recommended, because she did not meet the hold criteria and she harbored some fear and anger directed at Avera for her traumatic loss.  AR927.  Her mood on discharge was depressed and angry, mood congruent and insight fair with poor judgment. AR927.

### 10.    State Agency Assessments

The state agency psychologist at the initial level on June 19, 2014, found that Ms. Eastman had severe affective disorder and severe anxiety disorder. AR246-47.  The expert found that Ms. Eastman had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace and no repeated episodes of decompensation, each of extended duration.  AR247.  The expert found she was moderately limited in her ability to understand and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the public, and respond appropriately to changes in the work setting.  AR248-50.  The expert stated

Ms. Eastman was capable of understanding, remembering, and carrying out "2 step" instructions, but is not capable of more detailed instructions on a consistent basis due to her anxiety. AR249. The expert stated, "she reports a history of learning disorder but there is no current diagnosis or indication of cognitive deficit and she has worked SGA in the past." AR249. The expert stated Ms. Eastman could sustain a basic level of attention and concentration for two hour segments throughout a typical work day if she was in a routine environment, she would require reduced contact with the public and is not capable of working in a crowd, and she was only capable of responding appropriately to basic changes in the work setting if it was routine. AR249-50.

The state agency psychologist at the reconsideration level on November 24, 2014, made almost identical findings as the psychologist at the initial level. AR260-65. This assessment was reviewed by a second psychologist on January 22, 2015, who indicated agreement with the assessment, but gave no explanation or analysis. AR920-21. The second psychologist also reviewed the psychiatric review technique form and again indicated agreement without explanation or analysis. AR918.

**D.    Testimony at ALJ Hearing**

**1.    Ms. Eastman's Testimony**

Ms. Eastman testified she had a high school diploma, but was in special education for all of her classes for elementary, middle and high school. AR209. She said she had problems with reading, math, paying attention, and memorizing things. AR209. She said she could read a newspaper article but

27

sometimes doesn't understand the words. AR210. When asked about writing, Ms. Eastman testified that her handwriting was good but writing sentences and paragraphs was a problem. AR210. She said she could write a list of five things she wanted to do, but could never do a one-page book report. AR210. She said she could fill in her name and address on a form, but she would need help with more than that. AR210-11. When asked about cooking she said she had a hard time putting things together, "like I'm just more basic," and her husband did most of the cooking. AR225.

Ms. Eastman testified she worked at the post office initially as a mail handler and then switched to processing clerk, and it was a struggle trying to remember numbers like zip codes and where they go, even though she was told repeatedly where they go. AR208. She testified that she was disciplined all the time for not being able to keep the zip codes and stuff straight. AR231. She said she had quite a few "job talks" and they would always come up to her and test her and she could never remember. AR231. She said the job ended because of pregnancy difficulty, stress, and anxiety that was arising at the end because of her struggle, then the pregnancy made it worse. AR208. When asked about doing a job at the hearing Ms. Eastman said she would struggle a lot with trying, with someone trying to teach her things, and to comprehend them, it would take a lot of patience for a person to help her. AR229.

Ms. Eastman testified she worked for a job called "price management." AR234. When asked what she did in that job she said she went around putting sale signs on items, and there were other things she was supposed to do but

28

she had a hard time understanding it, so a co-worker would do most of the other things for her.  AR234.

Ms. Eastman testified that in 2013 her body went into shock and deep depression and her anxiety went through the roof.  AR211.  She said she couldn't focus on anything or sleep at night and was having nightmares. AR211.  She testified she was taking fluoxetine, bupropion, prazosin, hydroxyzine, trazodone, and clonazepam. AR212.  She said they seemed to help but made her really tired.  AR213.

Ms. Eastman testified that she was still depressed, still had flashbacks of that event and she isolates herself. AR213.  She explained that she has flashbacks to being in the hospital and almost dying.  AR232.  She said she still had anxiety and worried about a lot of things but wasn't sure why.  AR214. Ms. Eastman said she thought her depression and anxiety were better with her medications, but "it comes and goes, I just don't know when it happens." AR215.  She said she is mostly at home and when she feels like she needs to get stuff done and she can't do what she needs to do it really gets to her. AR215.

Ms. Eastman testified that she had been in counseling but it had been a few months since she had gone because she was just isolating herself from going anywhere but she knew she needed to get back.  AR215-16.

Ms. Eastman testified that she had problems with her lower back and neck with daily nerve pain and sharp pain in her neck which goes down into her shoulders.  AR216.  She said she takes hydrocodone for the neck pain.

29

AR217.  She said she had tried physical therapy which helped a little bit, but the pain just comes back and she had trouble standing due to the pain and had to take breaks when doing the dishes after 15 minutes at the longest. AR217-18.  She said she could not lift laundry baskets but though she could lift a 20 pound box off the table and carry it into the other room or lift a case of pop but she had problems bending over to pick something up or tie her shoes. AR219-20.  Ms. Eastman testified that her back pain was even worse than her neck pain, and the hydrocodone barely takes the edge off; she still got nerve pain down her left leg and it got numb.  AR218.  With the hydrocodone she was taking, Ms. Eastman rated her neck pain 5-6/10 and her back pain 7-8/10. AR219.  She said she had also tried steroid injections but they didn't help and surgery was the only option but she had been trying to avoid it – "really don't want to go under."  She explained she had a hard time with just her thyroid surgery, and everything after the bleeding at Avera.  AR231.

Ms. Eastman testified that she continued to have pain in the back of her shoulder when she uses it more, but if she had to she could lift her left arm above her head.  AR223.  She said her left knee had not gotten better, it bothered her especially going up and down stairs and she had a brace she wears.  AR223.

Ms. Eastman testified her thyroid cancer was completely resolved but it still impacted her energy level.  AR229.

Ms. Eastman testified she had problems sitting due to pain and pain when she tries to get up after even a "few minute drive" from her house to the

store.  AR222.  She said she could sit about 30 minutes in a more comfortable chair, but it still hurts when she gets up.  AR222.  Ms. Eastman testified that 3-4 times per week she would lie down and rest during the day and the other times she would have spurts of energy where she tried to catch up on things, but she would get so drained toward the end where she couldn't do anything for her kids.  AR226.  She said she did some housekeeping in small increments with breaks.  AR227.

Ms. Eastman testified that she used to go to church every Sunday "until that year happened."  AR227.  When asked about meetings or activities at school for her kids she said they make special arrangements for her and usually tried to do it over the phone rather than going there, but she could go to one of her kid's events for a short period of time.  AR228.

## 2.    Vocational Expert Evidence and Testimony

Ms. Eastman's attorney stated that he did not have any objections to the vocational expert's (VE's) qualifications to testify as a vocational expert.  AR232-33.  He raised no objection to Exhibit 14E, the VE's report, when the ALJ entered it into evidence.  AR203.

The ALJ's first hypothetical question to the VE was:

we have a younger individual with a high school education, our hypothetical individual with a past work history that we've described here today.  This individual would be able to lift and carry 20 pounds occasionally and 10 pounds frequently.  This individual would be able to sit for about six hours in an eight hour work day, and stand and or walk combined for about six hours in an eight hour work day.  Our hypothetical individual could never climb ladders, ropes, or scaffolds, but occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl.  Our

> hypothetical individual should have no more than occasional
> exposure to work around hazards, such as unprotected heights
> and fast and dangerous moving machinery.  From a mental
> standpoint, our hypothetical individual would be limited to simple
> tasks.  This individual would be able to maintain concentration,
> persistence, and pace for two hour work, excuse me, for two hours
> segments.  This individual would be able to respond appropriately
> to brief and superficial interactions with the general public.

AR234-35.  The VE testified the individual would be able to perform the jobs of mail processing clerk and the job of price marker.  AR235.

The VE testified that if a person due to pain and psychologically based symptoms needed an additional 30 minute rest break in the morning and the same in the afternoon beyond the normal breaks offered they would not be able to work competitively.  AR235-36.  The VE testified that if the person was off task 20 percent or more of the workday or absent more than two days per month they would not be able to work competitively.  AR236.

The VE testified: Q: "Okay.  With regard to your testimony here today, has that been consistent with the information that's contained in the *Dictionary of Occupational Titles*?"  A:  "Yes, Your Honor, and the sound professional experience in that some of the items don't, the *DOT* doesn't deal with."  AR236-37.

In an April 2016, evaluation of Ms. Eastman's past work the VE identified it as "Mail Handler," a light, semiskilled job, and "Mail Processing Clerk," a light unskilled job.  AR429.  He also testified that she had past work as a "Price Marker," a light unskilled job.  AR234.

**E.    Other Evidence**

Ms. Eastman's husband submitted a letter received by SSA on May 17,

2016, in which he stated:

> Jennifer struggles most nights with having nightmares, anxiety,
> easily irritable, and her insomnia is stressful on her.  She is overly
> tired during the days from fighting sleep at night.  She is unable to
> stay on task with anything she tries to do.  She cannot focus on
> taking care of bills; I had to take over the finances due to her being
> short minded.  She often forgets things.  Her memory problems
> seem to elevate with stress.  I do all the grocery shopping because
> her anxiety level increases in crowded environments.  (She tends to
> be impulsive when really stressed and irritable).  I had to change
> my work schedule so I can take care of most things around the
> home.  I took a night job so I am able to take kids to school and
> pick them up as Jennifer is afraid to go to sleep in fear of not being
> able to wake up.  Due to Jennifer's lack of energy I have took on
> added daily chores at our home that she used to be able to do.
> Cooking Cleaning, ect.  I need to carry laundry baskets up and
> down the stairs to the laundry room because Jennifer can no
> longer carry them.  With the medicine Jennifer is taking I need to
> be around in the day time hours to do the driving.  There have
> been multiple days she is so emotional she just sits and cries.
> When it's really bad she isolates herself and doesn't seem to want
> to leave the house.  Her night terrors are very bad to the point she
> cries out during her dreams.  I try to be around as much as I can
> to comfort her.  She has her good days and then really bad ones.
> It's unpredictable. She lives with post-traumatic stress disorder
> caused by a medical mistake.  This condition has made it very
> hard to live a normal life.  The added trauma to her body, anxiety
> and stress maybe a contributor to her having thyroid cancer.
> During her treatment for cancer it was a must to be at home.  I
> had to do everything so there would be no radiation contaminating
> the household, utensils, clothes, ect.  I had to prepare low iodine
> meals, take care of her personal needs, and still deal with the
> needs of our children.  I love her very much!  After the accident she
> has not been the same since.  We just take it one day at a time.

AR438.

**F.     Disputed Facts**

1.     Ms. Eastman proposed and the Commissioner disputed the

materiality of:

> The ALJ considered the opinions of the state agency medical
> consultant at the initial level who found that Ms. Eastman did not
> have any severe physical impairment, and gave that opinion "no
> weight" as additional evidence added to the record later showed
> severe symptoms.  AR24.

2.     Ms. Eastman proposed and the Commissioner disputed the

materiality of:

> The ALJ considered the opinions of the state agency medical
> consultant at the reconsideration level who found that Ms.
> Eastman could perform medium exertion work and gave that
> opinion "little weight" because the consultant did not treat or
> examine Ms. Eastman, and additional evidence added to the record
> later showed Ms. Eastman's continued pain and treatment and the
> effect of her mental health symptoms on her physical pain did not
> support the assertion that she was capable of medium exertion
> work.  AR24.  Similarly, a second medical consultant's opinion at
> the reconsideration level was also given "little weight" by the ALJ.
> AR24.

3.     Ms. Eastman proposed and the Commissioner disputed the portion

in bold:

> The ALJ stated that the record contained "a Global Assessment of
> Functioning (GAF) score" citing Exhibit 4F/12, and stated she gave
> the score "some weight."  AR25.  The GAF score listed at the record
> cited by the ALJ was 55 on December 24, 2013.  AR525.  **The ALJ
> did not mention any of the other GAF scores present in the
> record in her decision.  AR13-26.**

4.     Ms. Eastman proposed and the Commissioner disputed the

materiality of:

> The state agency physician expert evaluated the file at the initial
> level on May 22, 2014, and found that Ms. Eastman had no severe

physical impairments, did not identify any physical medically determinable impairments, and prepared no physical RFC assessment. AR246-47.

5.      Ms. Eastman proposed and the Commissioner disputed the materiality of:

> The state agency physician expert evaluated the file at the reconsideration level on January 8, 2015, and found that Ms. Eastman had severe dysfunction – major joints and severe thyroid gland disorder. AR260, 263. The expert found that Ms. Eastman could occasionally (cumulatively up to 1/3 of an 8-hour work day) lift 25 pounds, and stand and/or walk, and sit about 6 hours in an 8-hour work day due to neck pain with MRI showing mild DDD, and surgically treated thyroid cancer with good prognosis. AR262. The expert found no other limitations and stated that "Symptoms out of proportion to the objective findings. Anxiety and depression are symptoms which may be contributing to her symptoms." AR262. This assessment was reviewed by a second physician on January 21, 2015, who stated the assessment was medically reasonable, but gave no explanation or analysis. AR916-17.

## DISCUSSION

## A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis,

not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

36

Where, as in this case, new and material evidence is submitted on appeal to the Appeals Council and made a part of the record, this court on appeal considers the new evidence and attempts to determine what the ALJ would have decided had the ALJ had the benefit of the new evidence before it. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); Browning v. Sullivan, 958 F.2d 817, 822-23 (8th Cir. 1992).  Accordingly, even though the new and material evidence was not before the ALJ when it rendered its decision, this court considers the entire record, including the new evidence, in determining if substantial evidence in the record supports the ALJ's decision.

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.909 - .911.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential  analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 416.920.  The five steps are as follows:

> **Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. §416.920(a)(4)(ii).  If there is no such impairment or combination of impairments  the applicant is not disabled and  the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.920a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 416.920(a)(4)(iii).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 416.920a.

> **Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv); 416.945  If the applicant's RFC does not allow her to meet the

38

physical and mental demands of her past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with her age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 416.912.  The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. Eastman asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in four ways: (1) the Commissioner failed to properly identify Ms. Eastman's severe intellectual disorder; (2) the Commissioner erred when evaluating whether Ms. Eastman's impairments met a Listing; (3) the

Commissioner's determination of Ms. Eastman's residual functional capacity (RFC) was not supported by substantial evidence; and (4) the Commissioner erred by relying on vocational evidence that was not supported by substantial evidence. The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Eastman was not disabled during the relevant time frame and the decision should be affirmed.

**E.     Whether the Commissioner Failed to Properly Identify Ms. Eastman's Severe Intellectual Disability at Step Two?[4]**

It is the claimant's burden at step two to demonstrate a severe medically determinable impairment, but that burden is not difficult to meet and reasonable doubt about whether the claimant met her burden is resolved in favor of the claimant. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)); Newell v. Comm'r Social Security, 347 F.3d 541, 547 (3d Cir. 2003). Step two presents a two-part inquiry: (1) is there a medically determinable impairment established by objective medical evidence from an acceptable medical source

---

[4] The parties use varying terms to describe Ms. Eastman's condition (cognitive impairment, intellectual impairment, mental retardation). The court uses the term "intellectual disability" as that is the term used in the Commissioner's listings which were in effect at the time the ALJ made its decision. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The listings were changed effective January 17, 2017, but the old listings apply to Ms. Eastman's claims. See 81 Fed. Reg. 66138. The former listings can be found at https://secure.ssa.gov/poms.nsf/lnx/0434132009.

(20 C.F.R. § 416.921); and (2) is that impairment "severe."  An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. § 416.922(a).  Basic work activities include, but are not limited to:  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).

The Commissioner has stated the same standard in its policy guidance as follows: "An impairment . . . is 'not severe' . . . when medical evidence establishes only a slight abnormality . . .  which would have no more than a minimal effect on an individual's ability to work . . ."  See SSR 85-28.  The Commissioner cautions that "[g]reat care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step."  See SSR 85-28.  "The step two inquiry is a de minimus screening device to dispose of groundless claims."  Newell, 347 F.3d at 547; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  See also Bowen v. Yuckert, 482 U.S. 137, 153 (1987) (holding step two is a valid exercise of the agency's rulemaking authority to identify "at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience

41

were taken into account."). Harper v. Sullivan, 1991 WL 24908 *4 (E.D. Pa. 1991) (step two is a *de minimus* standard to reject only those most trivial of claims).

At step two of the sequential evaluation the ALJ found Ms. Eastman had the following severe impairments:  mild degenerative disc disease of the cervical and lumbar spine; osteopenia of the left knee; affective disorder; and anxiety disorder.  AR15.  Missing from this list of severe impairments was any mention of Ms. Eastman's intellectual disability.  Ms. Eastman asserts the ALJ erred by not determining she had a severe intellectual disability at step two of the analysis.  The Commissioner asserts the record supports the ALJ's decision that Ms. Eastman's intellectual disability was not severe.

The ALJ offered the following explanation for finding Ms. Eastman's intellectual disability to be non-severe:

> [T]here are references to the claimant's intellectual/learning disability in the record.  However, this does not represent a medically determinable impairment, as there is no definitive diagnosis of this condition from an acceptable medical source or an indication in the claimant's records of a cognitive defect (20 C.F.R. § 416.913(a)).  Additionally, the undersigned finds that the claimant's alleged intellectual disability does not meet the requirements of medical listing 12.05, as there is no evidence of deficits in adaptive functioning before age 22.  The claimant reported that she was in special education and had difficulties in math and reading.  This is consistent with the claimant's educational records, which shows a Full Scale IQ of 64 and a grade point average of 2.7 (Exhibit 15E/3).  However, the claimant testified that she graduated high school and had a driver's license. She also reported that she could read the newspaper to some extent.  The claimant also worked for the [United States] Post Office at substantial gainful activity levels prior to the alleged onset date.

> The undersigned notes that although the claimant's intellectual
> disability is a non-medically determinable impairment in this
> record, her alleged limitations fall within the very simple, unskilled
> work that is set out in the residual functional capacity below.

See AR16-17. Thus, the ALJ appears to have disregarded Ms. Eastman's

intellectual disability on the grounds that: (1) there was no medically

determinable impairment established by objective medical evidence from an

acceptable medical source; (2) even if there were, the impairment *did not meet*

*Listing 12.05*; and (3) the RFC formulated by the ALJ was not inconsistent with

the limitations imposed by Ms. Eastman's intellectual disability.

### 1.    Was There Evidence of a Medically Determinable Impairment from an Acceptable Medical Source?

In reaching the conclusion that this element at step two was not met, the

ALJ cited to 20 C.F.R. § 416.913(a), describing "categories of evidence." AR16.

Because step two requires evidence of a medically determinable impairment

established by objective medical evidence from an acceptable medical source,

the court homes in on that part of § 416.913(a).

The referenced regulation defines "objective medical evidence" as

"medical signs, laboratory findings, or both, as defined in § 416.902(k)." The

cross-reference is unavailing as § 416.902(k) simply states in its entirety—

"[o]bjective medical evidence means signs, laboratory findings, or both." It is

the same definition as found in § 416.913(a).

Section 416.902(a) defines an "acceptable medical source" to include a

licensed physician or psychologist, including a school psychologist for purposes

of determining impairments of intellectual disabilities.  See 20 C.F.R.
§ 416.902(a)(1) & (2).

   The record in this matter includes evidence that a school psychologist
administered the Wechsler Intelligence Scales test on January 28, 1993, when
Ms. Eastman was 16 years and 3 months old.  AR432.  On that date,
Ms. Eastman scored a 54 on her verbal intelligence quotient (IQ), an 80 on her
performance IQ, and had a full scale IQ of 64.  Id.  The results of another
Wechsler testing session from 1987 when Ms. Eastman was approximately 11
years old showed a verbal IQ of 57 and a performance IQ of 89.  Id.

   On the same date (1993), the psychologist administered the Woodcock-
Johnson test.  Id.  Ms. Eastman scored in the 15th percentile for letter-word
identification, the 25th percentile for passage comprehension, the 5th
percentile for applied problems, and the 3rd percentile for diction.  Id.  The
Woodcock-Johnson test is valid for all ages and is designed to measure
intellectual ability, academic achievement, cognitive abilities, and oral language
with an eye to identifying and documenting learning disabilities and planning
individual education programs.  See https://www.tests.com/Woodcock-
Johnson-Testing, last checked July 23, 2018.

   The Wide Range Achievment Test—Revised, was also administered in
1993 and yielded similar scores.  AR432.  Ms. Eastman scored in the 5th
percentile for reading and spelling and the 8th percentile for arithmetic.  Id.

Ms. Eastman's grade equivalence was the 5th grade for reading and spelling and the 7th grade for arithmetic.[5]  Id.

The school psychologist who administered these tests noted that Ms. Eastman had been in special education classes since elementary school. AR433.  The tester noted that Ms. Eastman was friendly and cooperative and appeared anxious to do well on the tests.  Id.  The psychologist interpreted the results of the testing to place Ms. Eastman in the "overall deficient range" with verbal scores "significantly lower than performance scores suggesting a communication handicap."  Id.  The psychologist recommended that Ms. Eastman remain in special education classes.  Id.

Section 416.921 defines what is meant by "medically determinable impairment."  See 20 C.F.R. § 416.921.  That regulation states in pertinent part:

> Your impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source.  We will not use your statement of symptoms, *a diagnosis*, or medical opinion to establish the existence of an impairment(s).

Id. (emphasis supplied).

_____

[5] The Commissioner initially stipulated that the scores from the Woodcock-Johnson and Wide Range Achievement Test "were consistent with the intellectual impairment shown in the IQ test results."  JSMF ¶ 22.  She now seeks to withdraw this stipulation.  See Docket No. 12 at p. 2.  The court disregards the stipulated fact.  The results of the tests are self-explanatory in the record.

The Commissioner argues that Ms. Eastman does not meet the definition for intellectual disability as set forth in the Diagnostic and Statistical Manual (DSM), essentially encouraging this court to accept the Commissioner's brief as expert testimony.[6]   The Eighth Circuit has pointed out, however, that the medical definition of mental retardation is not identical to the legal definition and has rejected an invitation to rely on the DSM in place of the Commissioner's own regulatory definition.  Ash v. Colvin, 812 F.3d 686, 692 (8th Cir. 2016) (citing Cox v. Astrue, 495 F.3d 614, 618 n.4 (8th Cir. 2007)).

The Commissioner's regulations do not require a diagnosis of intellectual disability at step two.  In fact, the regulations reject the use of a diagnosis at all.  See 20 C.F.R. § 416.921 (stating "[w]e will not use . . . *a diagnosis* . . . to establish the existence of an impairment(s)").  Instead, the regulations insist on *objective* medical findings made by an *acceptable medical source.*  Id.

The psychologist's report satisfies both of these requirements.  The Wechsler test, the Woodcock-Johnson test and the Wide Range Achievement test are objective medical tests.  They were administered by an acceptable medical source.  And, to boot, there is the opposite of any finding of

_____

[6] The Commissioner cites to DSM V in her brief.  However, as Ms. Eastman points out, the Commissioner did not adopt the DSM V criteria for evaluating mental disorders until January 17, 2017.  Because Ms. Eastman's case was decided August 16, 2016, the earlier DSM IV would be applicable, not the DSM V.  The court notes the ALJ cited to the DSM *IV* in its opinion denying benefits when discussing the significance of Global Assessment of Functioning (GAF) scores.  AR25.

malingering—the tester noted that Ms. Eastman tried very hard to do well on the tests.

The Commissioner suggests that the IQ tests be disregarded because Ms. Eastman was young when she took them.  Ms. Eastman was 16 years, 3 months old, at the time she took the latter exam in the record.  AR432.  The Commissioner's own regulations establish that IQ scores tend to stabilize by age 16, a fact the Commissioner recognizes before this court.  See Docket No. 16 at pp. 6-7 (citing Listing § 112.00(D)(10)).  Therefore, Ms. Eastman's latter score, discussed above, is considered valid and indicative of her adult IQ—a fact the Commissioner implicitly concedes herein.

The earlier IQ test administered when Ms. Eastman was approximately 11 or 12 years old, is not considered by this court as substantive evidence of her current impairment.  It is, however, corroborating as the scores from the earlier IQ test are very similar to Ms. Eastman's IQ test administered at age 16 years + 3 months.

Step two does not require a substantial showing.  The claimant must show something above a "slight abnormality" that has more than a minimal effect on the claimant's ability to do work activities.  SSR 85-28.  Ms. Eastman made this showing of objective medical evidence from an accepted source establishing something more than a slight abnormality.  The ALJ erred in holding to the contrary.

## 2.    Is the Finding that an Impairment Does not Meet a Listing Coterminus with a Finding that there was No Severe Impairment?

The ALJ--as part of its *step two* analysis--recited the fact that

Ms. Eastman's disability did not meet the Listing at § 12.05 in support of its

holding that Ms. Eastman's intellectual disability was not a severe impairment.

This recitation by the ALJ was clearly part of the ALJ's *step two* analysis as the

ALJ separately set forth its analysis under steps two and three.  Compare

AR15-7 (heading **"2"**), with AR17-19 (heading **"3"**).  Step three of the

sequential analysis requires the ALJ to determine if any of the claimant's

disabilities meet or equal any of the Listings.  20 C.F.R. § 416.920(a)(4)(iii).  The

ALJ's citation to the fact Ms. Eastman could not meet or equal a listing *at step

two* raises the question whether the ALJ misconstrued the legal test at step

two.

The analysis under step two and step three is distinct.  As described

above, the two questions the ALJ must evaluate at step two are (1) whether an

impairment is established by objective medical evidence from an acceptable

source and (2) whether it is "severe."  Whether the impairment is "severe" is

determined by whether the impairment imposes a limitation that is more than

minimal on the claimant's physical or mental ability to do basic work activities.

See 20 C.F.R. § 416.922(a); SSR 85-28.  If step two is a "*de minimus* screening

device to dispose of groundless claims,.." (Newell, 347 F.3d at 547; Smolen, 80

F.3d at 1290), step three is also a way to fast-track claims which have an

obvious end—in the other direction—where the claimant is clearly entitled to

48

benefits.  See Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (stating that the "listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.").

While a negative holding at step two results in the weeding out of groundless claims, a positive holding at step three results in the early and speedy award of benefits.  Bowen, 482 U.S. at 141 (stating that the Secretary acknowledges that meeting a listed impairment represents a condition of sufficient severity as to preclude substantial gainful activity and to give rise to a conclusive presumption of disability).  The Supreme Court approved the streamlining effects of both step two and step three as a reasonable exercise of the Commissioner's delegated powers to uniformly and efficiently make disability determinations.  Id. at 153.  But they are decidedly distinct steps with distinct purposes—one to weed out meritless claims early on, and one to identify meritorious claims early on.

There is, of course, some overlap between step two and step three—a condition that is "severe" at step two may also result in a finding of "disabled" under the Listings at step three.  But the reverse is **not** true.  A negative finding at step three (the claimant does not meet or equal a Listing), does not mean that the claimant's condition is necessarily non-severe at step two.[7]  See

---

[7] And, conversely, a claimant cannot simultaneously satisfy the listing-level criteria at step three, and fail to satisfy the severity requirement at step two. Williamson v. Sec'y. of Health & Human Servs., 796 F.2d 146, 150 (6th Cir. 1986).  This is because the step three finding is a level of presumptive disability

<u>Zebley</u>, 493 U.S. at 534 (stating that "there are several obvious categories of claimants who would not qualify [for disability benefits] under the listings, but who nonetheless would meet the statutory standard" for awarding such benefits); <u>Chico v. Schweiker</u>, 710 F.2d 947, 951 (2d Cir. 1983) (a claimant whose condition is severe enough to satisfy step two, but not severe enough to meet or equal a Listing at step three proceeds on to steps four and five); <u>Rams v. Chater</u>, 989 F. Supp. 309, 317 (D. Mass. 1997) ("A step three finding that plaintiff's condition is not listed in Appendix 1 to the regulations is not outcome-determinative as a matter of law and does not eliminate the need to make an appropriate step-two finding."); <u>Harper</u>, 1991 WL 24908 at *6 (stating "[t]he listings are only employed at step three of the sequential process and, therefore, are irrelevant to severity determinations at step two.").

If it were otherwise there would be no need for steps four and five of the sequential analysis—a failure to meet step three would always result in dismissal just as success in meeting step three would always result in an award of benefits. <u>Chico</u>, 710 F.2d at 951.

The ALJ in Ms. Eastman's case appears to have confused this analysis. The ALJ disposed of Ms. Eastman's intellectual disability at step two because it

---

because of the existence of an impairment that *exceeds* the level of severity required by Congress' Act. <u>Id.</u>  One cannot have a *more* severe condition than Congress required and also fail to have a severe impairment at step two. <u>Id.</u>

did not meet the Listing—which applies **only** at step three. <u>Zebley</u>, 493 U.S. at 534; <u>Harper</u>, 1991 WL 24908 at *6.

A similar mistake was made by the ALJ in <u>Arroyo v. Sec. of Health & Human Servs</u>., 558 F. Supp. 482, 484 (D.P.R. 1983). In holding that the claimant's mental condition was non-severe at step two of the analysis, the ALJ in that case made reference to the Listings and the fact that the claimant's condition did not meet or equal those Listings. <u>Id.</u> The reviewing court emphasized that the step two inquiry is not whether the claimant's condition met or equaled a Listing, but rather, whether the condition was of sufficient severity (as defined by the regulations) to significantly limit basic work functions. <u>Id.</u> at 485. The court reversed because the ALJ had failed to apply the agency's own regulations for determining "severity" at step two and had instead mistakenly applied the step three criteria to arrive at a conclusion at step two. <u>Id.</u>

Similarly, in <u>Chico</u>, the ALJ recited the language of the step two regulation, but appeared to adopt a physician's definition of "severity" which was erroneously based on whether the claimant's condition met or equaled a Listing. <u>Chico</u>, 710 F.2d at 954. The court held that a claimant who did not meet or equal a Listing at step three was "clearly" not required to demonstrate Listing-level severity in order to satisfy the showing of severity required by step two. <u>Id.</u> at 954-55. "Such an interpretation would," the court stated, "render

otiose"[8] the regulations describing steps four and five.  Id. at 955.  Instead, the court held, a person may have a "severe" impairment under the regulations which, even though it may not meet or equal a Listing, nevertheless entitles him to reach step four of the analysis because the condition "significantly limits his basic work activities."  Id.  The court concluded the ALJ mistakenly thought, on the basis of the physician's testimony, that the claimant had to meet or equal a Listing in order to establish "severity" at step two.  Id.  Because of this error, the court reversed and remanded.  Id.  See also Harper, 1991 WL 24908 at *6 (reversing and remanding where the ALJ—and the magistrate judge—erroneously used the Listing criteria from step three to determine that the claimant did not meet the "severity" requirement at step two).

In Zebley, the Court examined regulations the Commissioner had developed for evaluating whether children were eligible for disability benefits. Zebley, 493 U.S. at 524-26.  Although Congress passed a statute directing the Commissioner to develop regulations for children who had impairments of "comparable severity" to adults who were entitled to disability benefits, the Commissioner's child regulations contained only three steps:  (1) was the child engaged in substantial gainful employment, (2) did the child have an impairment expected to last longer than 12 months or result in death, and (3) did the child's condition meet or equal a Listing.  Id. at 524, 526.

---

[8] "Otiose" means "serving no practical purpose or result."  In other words, superfluous.

The Commissioner's regulations for child claims did not contain a step of analysis similar to step two of the adult analysis for demonstrating the existence of a "severe" impairment outside the rigors of the Listings.  Id. at 526. Because there were numerous ways adults could show they were disabled without meeting or equaling a listing, the Court held the Commissioner's regulations did not faithfully implement Congress' statutory directive because children with conditions of "comparable severity" were being excluded from benefits whereas their adult counterparts could obtain benefits by making the required showing at step two and beyond without having to meet the Listing-level descriptions.  Id. at 533-41.

Here, the ALJ made an error of law in requiring Ms. Eastman to meet the Listing-level severity at step two.  As demonstrated by the law discussed above, an impairment can meet the step two definition of "severity" without being able to meet the step three Listing requirement.  This error of law requires reversal and remand.

In doing so, the court notes that the record is replete with evidence of the severity of Ms. Eastman's condition.  As stated above, she was in special education classes from elementary school through high school.  AR430.  Her individual education program for her 12th-grade year noted that she met the eligibility requirement for Title 5, a California law, on the basis of a learning disorder.  AR435.  She was given specialized instruction in a small group setting due to her mental impairment.  Id.  In order to satisfy high school graduation requirements, the school allowed her to take math, English, and

53

reading tests with no time limits, in a small classroom setting, with any assistance she needed.  Id.  It was noted that the regular testing exceeded Ms. Eastman's current level of functioning.  Id.

This evidence clearly indicates more "than a minimal effect on an individual's ability to work."  See SSR 85-28.  Ms. Eastman's intellectual impairment would be expected to more than minimally affect basic work activities such as speaking, dealing with changes in a routine work setting, use of judgment, understanding, and carrying out and remembering simple instructions.  The ALJ erred in determining Ms. Eastman did not carry her burden of demonstrating a severe intellectual disability at step two.

### 3.    Was the ALJ's RFC Consistent with Ms. Eastman's Intellectual Disability?

Although Ms. Eastman raises this issue in support of her step-two argument, she also raises an omnibus issue which requires the court to evaluate the totality of the RFC determined by the ALJ.  Accordingly, this court defers discussion of the RFC issue to the omnibus argument below.

### F.    Whether the Commissioner Erred When Evaluating Whether Ms. Eastman's Intellectual Disability Met a Listing?

*Now*, at *step three*, it is appropriate to consider the Listing for intellectual disability and to determine whether Ms. Eastman meets or equals that Listing.  Ms. Eastman asserts she meets listing § 12.05B and C and that the ALJ erred in concluding to the contrary.

Because the ALJ did not find Ms. Eastman's intellectual impairment to be severe at step two, the ALJ did not discuss that matter in the step-three

54

portion of the opinion denying benefits.  Here is the discussion from the ALJ's

step-two portion of the opinion:

> Additionally, the undersigned finds that the claimant's alleged
> intellectual disability does not meet the requirements of medical
> listing 12.05, as there is no evidence of deficits in adaptive
> functioning before age 22.  The claimant reported that she was in
> special education and had difficulties in math and reading.  This is
> consistent with the claimant's educational records, which shows a
> Full Scale IQ of 64 and a grade point average of 2.7 (Exhibit
> 15E/3).  However, the claimant testified that she graduated high
> school and had a driver's license.  She also reported that she could
> read the newspaper to some extent.  The claimant also worked for
> the [United States] Post Office at substantial gainful activity levels
> prior to the alleged onset date.

AR16-17.

The Listings in question regarding intellectual disabilities were revised

and replaced as of September 29, 2016.  Ms. Eastman's hearing before the ALJ

took place May 17, 2016, and the ALJ issued its decision August 16, 2016.

AR13, 26.  Therefore, the former version of the Listings in effect prior to

September 29, 2016, apply to Ms. Eastman's claim.[9]  The former version of

§ 12.00 provides an overview of the intellectual disability Listing (§ 12.05) in

pertinent part as follows:

> The structure of the listing for intellectual disability (12.05) . . .
> contains an introductory paragraph with the diagnostic description
> for intellectual disability.  It also contains four sets of criteria
> (paragraphs A through D).  If your impairment satisfies the
> diagnostic description in the introductory paragraph and any one

---

[9] The former listings can be found at
https://secure.ssa.gov/poms.nsf/lnx/0434132009, last checked July 24,
2018.

of the four sets of criteria, we will find that your impairment meets
the listing.  Paragraphs A and B contain criteria that describe
disorders we consider severe enough to prevent your doing any
gainful activity without any additional assessment of functional
limitations.  For paragraph C, we will assess the degree of
functional limitation the additional impairment(s) imposes to
determine if it significantly limits your physical or mental ability to
do basic work activities, i.e., is a "severe" impairment(s), as defined
in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s)
do not cause limitations that are "severe" as defined in 404.1520(c)
and 416.920(c), we will not find that the additional impairment(s)
imposes "an additional and significant work-related limitations of
function," even if you are unable to do your past work because of
the unique features of that work.  Paragraph D contains the same
functional criteria that are required under paragraph B of the other
mental disorders listing.

See 20 C.F.R. 404, Subpart P, Appendix 1 (hereinafter "Listings"), § 12.00.[10]

Section 12.00 also specifies that IQ scores, while only part of the overall

assessment of intellectual disability, are essential to the adjudication of all

cases of intellectual disability except under subsection A of Listing § 12.05.

See Listing § 12.00D(a) & (b).  Where an IQ test such as the Wechsler series

tests gives a verbal, performance, and full scale IQ score, the Commissioner

uses the lowest of these scores in conjunction with Listing § 12.05.  See Listing

§ 12.00D(c); Reed v. Colvin, 779 F.3d 725, 726 (8th Cir. 2015).

Section 12.05 states in its entirety as follows:

**12.05  *Intellectual Disability:*** Intellectual disability refers to
significantly subaverage general intellectual functioning with
deficits in adaptive functioning initially manifested during the
developmental period; i.e., the evidence demonstrates or supports
onset of the impairment before age 22.

---

[10] The quoted text is the former version of Listing § 12.00.  See footnote 9,
*supra*, for where to locate this cited regulation.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A.  Mental incapacity evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in two of the following:
>
>> 1.  Marked restriction of activities of daily living; or
>> 2.  Marked difficulties in maintaining social functioning; or
>> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>> 4.  Repeated episodes of decompensation, each of extended duration.

See Listings § 12.05 (pre-2016 version). Ms. Eastman asserts the record evidence demonstrates she met paragraphs B and C of Listing § 12.05.

To meet either listing paragraph B or C, Ms. Eastman must first show significantly subaverage intellectual functioning with deficits in adaptive functioning present before age 22. Id.; Maresh v. Barnhart, 438 F.3d 897, 899

(8th Cir. 2006) (claimant must meet the requirements of the introductory paragraph plus the requirements of paragraphs A, B, C or D).  If Ms. Eastman can show this, she next needs to show a valid verbal, performance, or full scale IQ of 59 or less to satisfy paragraph B.  See Listing § 12.05B.

Alternatively, if she can make the initial showing of deficits in adaptive functioning, she can meet the paragraph C criteria by showing two additional factors:  (a) a valid verbal, performance, or full scale IQ of 60 – 70 *plus* (b) an additional physical or mental impairment imposing an additional and significant work-related limitation of function.  Id. at C.  A formal diagnosis of mental retardation or intellectual disability is not necessary for paragraph B or C; all that is necessary is that the Listing requirements be met.  Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007); Maresh, 438 F.3d at 899.

As discussed above, Ms. Eastman had a verbal IQ score of 54 when she was 16 years and 3 months old.  AR432.  Because one uses the lowest of her IQ scores under the Wechsler test, the court uses this score for purposes of Listing § 12.05B.  See Listing § 12.00D(6)(c).  Furthermore, as also discussed previously, there is no indication this score is invalid.  Prior to age 16, Ms. Eastman scored a comparable verbal IQ of 57, thus corroborating circumstantially the score from when she was 16.  In addition, the notes of the school psychologist who administered this test at age 16 documented that Ms. Eastman was cheerful and cooperative and endeavored to try hard on the test.  Id.  Thus, Ms. Eastman meets the paragraph B criteria of an IQ score below 59.  See Listing § 12.05B.  The analysis of whether she meets or equals

58

Listing § 12.05B depends, then, on whether she can meet the initial criteria which applies to all four subparagraphs of Listing § 12.05. Specifically, the parties' arguments center on whether there is substantial evidence in the record to support the ALJ's determination that Ms. Eastman did not have "deficits in adaptive functioning."

The analysis of whether Ms. Eastman can meet Listing § 12.05C is similar. She meets the first paragraph C criteria because she has an IQ score that is between 60 and 70, as discussed above. AR432 (showing verbal, performance, and full scale IQ scores of 54, 80, and 64, respectively). Also, because the ALJ found she had other impairments which were severe, this finding supports the second paragraph C criteria. Lott v. Colvin, 772 F.3d 546, 550 (8th Cir. 2014) (ALJ's finding of other "severe" impairments at step two of the sequential analysis satisfies the second paragraph C criteria of Listing § 12.05C). Once again, then, the analysis of whether Ms. Eastman meets or equals Listing § 12.05C depends on whether she can satisfy the criteria in the introductory paragraph to § 12.05 by showing she had deficits in adaptive functioning before age 22.

The adult Listings do not define "deficits in adaptive functioning." The child Listings do define the phrase as follows: it "refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands. It is your typical functioning at home, at school, and in the community, alone or among others." See Listings, Part B, § 112.05H3.

The Eighth Circuit examined the following in determining deficits in adaptive functioning in <u>Scott v. Berryhill</u>, 855 F.3d 853, 856-57 (8th Cir. 2017): completing high school, having a driver's license, living independently, reading, balancing a checkbook, managing finances, engaging in unskilled or semi-skilled work, cooking, doing laundry, cleaning house, following instructions, performing simple math, shopping for groceries, communicating well, thinking logically, and not needing reminders to finish tasks.

Other courts have similarly stated that deficits in adaptive functioning require the court to "examine the overall record to determine whether [the claimant] has significant limitations in her ability to cope with the challenges of ordinary everyday life." <u>Sutherlin v. Berryhill</u>, 2018 WL 2180262 at *6 (D. Minn. Jan. 12, 2018).

The DSM IV, applicable to Ms. Eastman's case (<u>see</u> footnote 6, *supra*), defines adaptive functioning as "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." <u>See</u> DSM IV, at p. 39 (1994). The DSM IV requires deficits in at least two of the above categories to constitute deficits in adaptive functioning for purposes of diagnosing intellectual disability.[11]

-------------------------

[11] The DSM IV uses the formerly accepted term, "mental retardation." For consistency, this opinion uniformly uses the term "intellectual disability."

In the <u>Christner</u> case, the court remanded for a re-examination by the ALJ whether the claimant had deficits in adaptive functioning where the claimant had worked only intermittently as a tree trimmer, dropped out of school in sixth or eighth grade, was in special education classes when he did attend school, did not live independently, and was not able to read or write. <u>Christner</u>, 498 F.3d at 794.

In <u>Maresh</u>, the court reversed with orders to award benefits, finding the claimant showed she had deficits in adaptive functioning as a matter of law. <u>Maresh</u>, 438 F.3d at 899-901.  Maresh had an adult verbal IQ score of 70, had struggled in special education classes, dropped out of school in the ninth grade, had frequent fights with other children when he was young, and had trouble reading, writing and doing math.  <u>Id.</u> at 900.  Based on this evidence, the court held the ALJ erred by concluding Maresh did not show deficits in adaptive functioning.  The Commissioner argued that because Maresh worked at General Mills for 18 months, his mental retardation did not preclude him from working.  <u>Id.</u> at 901.  The court rejected this argument, noting that Listing § 12.05C does not ask whether the claimant can perform gainful activity, but rather whether the claimant has an impairment other than an intellectual ability that provides a significant work-related limitation in function.  <u>Id.</u>

In <u>Miles v. Barnhart</u>, 374 F.3d 694, 698-700 (8th Cir. 2004), the ALJ's finding that the claimant did not meet Listing § 12.05 was affirmed where the claimant had held several jobs, was working full time at the time of the ALJ hearing, had never been enrolled in special education classes, received B

61

grades in her regular classes, finished a vocational rehabilitation course in computers, lived independently, passed a driver's license exam, had never been fired from a job because of lack of mental ability, and displayed no difficulty communicating.  Given this evidence, the court held the ALJ was justified in discounting an IQ score of 59.  Id. at 697-98.

In Johnson v. Colvin, 788 F.3d 870, 872-73 (8th Cir. 2015), the court affirmed the ALJ's conclusion that the claimant did not have deficits in adaptive functioning so as to meet Listing § 12.05.  Johnson could read, write, count change, care for her son, cook multiple-course meals, "follow a recipe word for word," and perform most household tasks, though she had never worked outside the home.  She attended some special education classes in school, and struggled with algebra, some reading, and history.  Id.  She did not have a driver's license, rode the bus, and visited with relatives.  Id.

In Scott, 855 F.3d at 856-57, the court affirmed the ALJ's finding that Scott had no deficits in adaptive functioning, though he met the other requirements of Listing § 12.05.  In particular, the court found Scott's ability to maintain unskilled and semi-skilled work "for multiple years" showed he did not have deficits in adaptive functioning.  Id.  The court noted Scott read poorly, could not balance a checkbook, or manage finances, but countered that he lived independently, thought logically, had a driver's license, drove and shopped for groceries, communicated well, was able to perform simple math, helped feed calves, cooked, did laundry, dusted, followed instructions, and did not need reminders to complete tasks.  Id.

In Vance v. Berryhill, 860 F.3d 1114, 1119, 1121 (8th Cir. 2017), the court affirmed denial of benefits based on the ALJ's finding of no deficitis in adaptive functioning. In that case the claimant had been in special education classes, was on an individual education program in school, graduated high school, had a driver's license, got married, had children, had limited employment history, and had difficulty performing some activities of daily living. Id. at 1119-20. Although Vance had an IQ score of 63 (full scale), the school psychologist reported she performed only "mildly below developmental levels" and that she "function[ed] within the educable range." Id. at 1120. The court held that, while there might be evidence in the record to support a conclusion that Vance had some level of intellectual disability, there was substantial opposing evidence in the record to support the ALJ's conclusion. Id.

The ALJ held Ms. Eastman did not meet or equal Listing § 12.05 because she did not have deficits in adaptive functioning. AR17. In so concluding, the ALJ relied on Ms. Eastman's full scale IQ of 64. AR17. See also AR25 (rejecting intellectual disability in the context of formulating RFC). This was error, as the Commissioner's own regulations direct the ALJ to use the lowest score as between verbal, performance, and full scale IQ. See Listing § 12.00D(6)(c). While Ms. Eastman's full scale IQ was 64, her verbal IQ was 54. AR432.

The ALJ also recited the fact that Ms. Eastman graduated high school and had a grade point average of 2.7. AR17. Again, this ignores the fact that

all of Ms. Eastman's substantive classes were special education classes, she was on an individual education program, and she was unable to meet high school graduation requirements unless given unlimited time to take the graduation tests, a small classroom setting, and assistance in taking the tests. AR435.

In addition, the ALJ recited the fact that Ms. Eastman could read the newspaper to some extent and worked for the United States Post Office at SGA levels prior to the alleged disability onset date. AR17. The Eighth Circuit has pointed out that if this were the proper interpretation of § 12.05, ALJs could deny benefits to all noninstitutionalized claimants with an intellectual disability on the basis of rudimentary activities like these. Lott, 772 F.3d at 551. In Lott, the ALJ found Lott did not meet Listing § 12.05 because, in part, he had successfully worked as an adult in mainstream jobs. Id. The court remanded to the agency because there was no formal IQ test score in Lott's record and a medical source's diagnosis of mild intellectual disability was insufficient to allow the ALJ to determine if Lott met Listing § 12.05C. Id. at 551-52.

Ms. Eastman's case falls somewhere in the heartland of these cases. She did graduate high school rather than dropping out, but was clearly unable to pass the exit exams on her own. AR430-37. She was enrolled in special education classes her whole life and had an individual education program, but she lives independently now, has married, and is raising four children.

She has worked sporadically, but with accommodations and does not have a longitudinal track record of holding serial jobs at an SGA level. She had annual earnings between $351 and $6,608 for the years 1993-2002, with no earnings in 1996. AR347. She again had no earnings for 2003-2006. Id. She had between $2,140 and $3,145 in earnings for the years 2007-09. AR347-48. No earnings appear for the year 2010, and she earned $6,789 and $26,501 in 2011 and 2012, respectively, while working at the post office. AR348.

She worked for a church on a part-time non-SGA basis from 2007-09 babysitting infants, toddlers and kindergartners. AR208. She worked approximately 12-18 months as a mail handler at the post office in 2011-12, but struggled because the job required her to remember zip codes to route the mail to the right places and she would always forget despite repeated instructions. AR207-08. She was hired by the Post Office to be a "mail handler," but had to switch to the job of "processing clerk" because she struggled with the job requirements. AR208, 231. During her time at the post office, she was subject to monthly "job talks" where her performance was discussed and her supervisor said her inability to remember zip codes was a huge problem that was going to affect her long term. AR231-32. Ms. Eastman quit her job at the post office from a combination of the stress and anxiety of not being able to remember the zip codes and from her miscarriage and the events which occurred subsequently. AR208.

Ms. Eastman also had a job at a discount store from 1997-99 and worked for three months as a temporary employee of the post office in 2001.

65

AR365.  She had job duties at the discount store which she was unable to perform because she could not understand, so a co-worker covered those duties for her.  AR234.

She has a driver's license and drives from time to time.  AR206-07. However, medication prescribed for her other conditions makes her "shaky" and so she limits her driving or has to plan ahead as to when she can take certain medicines.  AR207.

In school, Ms. Eastman had trouble with reading, math, paying attention, and memorizing.  AR209.  She is able to read English and can read a short newspaper article, but is not always able to understand all the words. AR210.  She can fill out a job application form, but cannot write a resume for herself without help.  AR210-11.  In school she was never able to write even a one-page book report.  AR210.  She has difficulty remembering doctor's appointments and sometimes has difficulty remembering to take medications. AR213-14.  She testified her biggest obstacle with working is the struggle with trying to have someone teach her things and her difficulty with comprehending them.  AR229.

Ms. Eastman does a significant amount of housework and cleaning and takes her children to school and work when her husband is unable to do so. AR372-79.  She feeds and waters pets.  Id.  She cooks daily, but it is painstaking as she has a hard time following a recipe.  Id.  Her hobbies include reading, doing crafts, and watching television.  Id.  She needs spoken

instructions repeated to her a few times and keeps notes to jog her memory. Id. She cannot follow written instructions well. Id.

It would appear Ms. Eastman can meet the DSM IV's definition of deficits in adaptive functioning because she clearly has deficits in communication, functional academic skills, and work. See DSM IV at p. 39. The Commissioner's own employee, upon interviewing Ms. Eastman, noted that she "talked slowly as if it took awhile to comprehend and answer," (AR360), thus giving credence to impairment in communication, one facet of adaptive functioning. The DSM IV would require deficits in only two of these three areas to satisfy the definition of deficits in adaptive functioning.

There is significant evidence on both sides of this issue. This is *not*, as the Commissioner characterizes it, a case where Ms. Eastman's IQ scores stand alone as the only evidence of her intellectual disability. However, a step three finding of disability is reserved for only those cases presenting a clear-cut entitlement to disability benefits without consideration of ability to perform past work. Zebley, 493 U.S. at 532; Bowen, 482 U.S. at 141. In addition, if substantial evidence supports either conclusion (i.e. disabled vs. not disabled), the court must affirm. Reed, 399 F.3d at 920; Woolf, 3 F.3d at 1213; Oberst, 2 F.3d at 250. Here, the court will not reverse with instructions to affirmatively award benefits at step three, but neither will the court affirm.

It appears that the ALJ found no deficits in adaptive functioning because Ms. Eastman is able to perform satisfactorily in the areas of self-care, home living, social/interpersonal skills, leisure, health and safety. But, as the DSM

67

IV and the above-discussed cases show, that is not the whole picture. Adaptive functioning encompasses much more. One can still satisfy the requirement of having deficits in adaptive functioning by showing difficulties in other areas, such as communication, functional academic skills, and work. Ms. Eastman has arguably made her showing in these latter categories.

As discussed elsewhere in this opinion, the ALJ erroneously disregarded the records from Ms. Eastman's high school, including the school psychologist's report. This is all the more an important lapse because Listing § 12.05 requires deficits in adaptive functioning *before* age 22. See Listing § 12.05. Ms. Eastman's school records are the only direct evidence in the record of what her adaptive functioning was like prior to age 22. Because the court is remanding for this error, the court will remand at step three as well. Upon remand, the ALJ should consider these records and the totality of deficits in adaptive functioning demonstrated by the record evidence in evaluating whether Ms. Eastman meets or equals Listing § 12.05.

## G. Whether The Commissioner's Formulation of Ms. Eastman's RFC is Supported by Substantial Evidence?

When a claimant establishes the existence of severe impairment(s) at step two, but cannot meet or equal a Listing at step three, the sequential analysis goes on to step four. Step four requires the ALJ to formulate Ms. Eastman's RFC and to determine if, given that RFC, she is capable of performing any of her past work. Here, the ALJ formulated an RFC that concluded Ms. Eastman could perfrom a range of light work limited to simple

68

tasks and requiring concentration, persistence and pace for two-hour segments with brief and superficial interactions with the general public.  AR19. Ms. Eastman asserts that both the physical and mental RFC the ALJ formulated are not supported by substantial evidence in the record.

### 1.    The Law Applicable to Formulating RFC

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability."  Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[12] <u>Lauer</u>, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." <u>Combs v. Berryhill</u>, 878 F.3d 642, 646 (8th Cir. 2017) (quoting <u>Steed v. Astrue</u>, 524 F.3d 872, 875 (8th Cir. 2008) (quoting <u>Cox</u>, 495 F.3d at 619)).  "The ALJ 'may not simply draw [its] own inferences about plaintiff's functional ability from medical reports.' " <u>Combs</u>, 878 F.3d at 646 (quoting <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004)).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u>  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory

───────────────────

[12] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted,

71

punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2.    Physical RFC

Regarding physical RFC, Ms. Eastman notes the ALJ discounted opinions of state agency medical consultants.  Ms. Eastman assigns as error the fact that the ALJ overlooked objective medical findings that she had a straightening of the normal cervical lordotic curvature in her neck and disk desiccation with small right posterolateral disk protrusion.  Ms. Eastman claims the ALJ erred by finding her thyroid cancer, left trapezious strain and cellulitis were non-severe impairments, but never addressed whether those impairments imposed any functional restrictions.  Also, Ms. Eastman asserts the ALJ erred by acknowledging her mental impairments impacted her physical pain, but failed to take that into account when formulating physical RFC. Ms. Eastman suggests the ALJ may have used the fact she never pursued spinal surgery against her, in contravention of the Commissioner's regulations. And, finally, Ms. Eastman argues the ALJ used her light, sporadic household and hobby activities improperly to conclude she was capable of a far higher degree of RFC on a sustained and continuous basis.

None of Ms. Eastman's treating physicians opined as to her physical RFC.  The Commissioner hired two nontreating nonexamining physicians to give physical RFC opinions, but the ALJ gave "little weight" to both of these

opinions because the physicians did not treat Ms. Eastman, did not examine Ms. Eastman, and because additional evidence came into the record after these opinions were rendered undermining the conclusions expressed in those opinions. AR21. So, there is no medical opinion evidence of Ms. Eastman's physical RFC.

The ALJ recognized that Ms. Eastman's neck and back pain were persistent problems. AR20. The ALJ recognized that there was objective medical evidence to support these symptoms. The ALJ noted that Ms. Eastman had cervical spine straightening and mild degenerative disc disease in her cervical spine. AR20. In connection with Ms. Eastman's cervical spine, the ALJ failed to note she had a disk protruding that mildly encroached on the left neural foramen. Compare AR 20 (ALJ's description), with AR893 (medical record).

As to Ms. Eastman's lumbar spine, the ALJ noted she had disk desiccation, a small right posterolateral disk protrusion at L5-S1 and a minimal disk bulge at L4-L5. AR21. The ALJ conceded that Ms. Eastman has received many varied and consistent treatments for pain from prescriptions for Valium and Hydrocodone, to chiropractic care and epidural steroid injections.[13] AR20-21. The ALJ also acknowledged Ms. Eastman had osteopenia in her left knee. AR21.

---

[13] Ms. Eastman was also prescribed Flexeril, Ultram, and Voltaren for pain. AR473-74; 478; 696-97; 702; 839-40.

The ALJ discounted Ms. Eastman's reports of disabling pain and limited function as not consistent with the record evidence. This was largely because medical evidence showed she had no problems with her thoracic spine and hips and because, on one occasion, a medical record stated she exhibited full strength in her upper and lower extremities. AR20-21. The ALJ also concluded Ms. Eastman's activities of daily living were inconsistent with her reports of pain. Id.

Ms. Eastman likens her case to the Combs case. In that case, the claimant's treating physicians had not given any opinions as to her ability to function in the workplace. Combs, 878 F.3d at 646-47. Two non-treating, non-examining physicians gave RFC opinons based upon their review of the record. Id. One opined the claimant could do only sedentary work, the other opined she could do light work. Id. The ALJ credited the opinion of light work, asserting that opinion was more consistent with treating physicians' notations that the claimant was in "no acute distress" and had "normal movements." Id. The Eighth Circuit noted it was undisputed that the claimant suffered from rheumatoid arthritis, that she was prescribed medicine for severe pain, that she had trigger points and pain with range of motion. Id. Given these undisputed facts, the court held the ALJ erred in its interpretation of the notations "no acute distress" and "normal movements" and that the ALJ should have developed the record to determine what these notations meant in terms of the claimant's RFC. Id. at 647.

74

The Commissioner relies on Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016), in support of its argument for affirming the ALJ. In Hensley, the claimant's treating physician from the Veteran's Affairs department was unable to give an RFC opinion due to regulations governing the performance of his job. Id. at 932. The physician did, however, write a "to whom it may concern" letter. Id. That letter, together with the physician's treatment records, provided substantial evidence in the record for the ALJ's RFC finding. Id. The court held that where there was no medical opinion evidence, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." Id. (quoting Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011)).

Here, the court finds the record devoid of any medical record or medical opinion supporting Ms. Eastman's physical RFC. The ALJ rejected the earlier consulting physicians' opinions because it felt those opinions were not consistent with evidence received into the record subsequently. The fact that one has full strength in one's extremities (at a single snapshot in time), is not necessarily inconsistent with pain experienced as a result of using those extremities. This case is distinguishable from Hensley because in that case, at least the ALJ had a letter from a treating physician addressing the claimant's functional abilities; here, once the ALJ discounted the consulting physicians' opinions, there was no evidence of functional abilities save the hard medical data. Sometimes hard medical data can yield the information needed to infer functional capabilities. The medical data here was not of such a nature. At

75

this point, the ALJ should have either ordered a consultative exam to determine physical RFC, or obtained another nontreating nonexamining opinion from a consulting physician based on *all* the medical evidence received.

Ms. Eastman's description of her own functional abilities declined over time within this record. She filled out function reports in March, 2014; August, 2014; October, 2014; and March, 2015. AR372-79, 380-87, 396, & 406. In the latter function reports, she described chronic back pain with muscle spasm, numbness, and sharp pain radiating down her left leg. AR406. She described having difficulting lifting, squatting, bending, standing, walking, sitting, and stair climbing. AR396. She stated she could walk, stand or sit for only 20 minutes at a time. AR406. Although in March, 2014, she described having little difficulty with household chores, later on she described not being able to carry groceries, sit while driving long distances, walk longer distances, or clean for more than one hour at a time. AR380, 386. Ms. Eastman's husband explained he had to take over grocery shopping, had to carry things for his wife, had to take over driving, and rearranged his work schedule to accommodate her impairments and so he could perform more of the household chores and child care. AR438.

Ms. Eastman's and her husband's testimony are not inherently inconsistent with the record. Even the ALJ reconized Ms. Eastman's back and neck pain were long-standing conditions and that she had consistently sought and received a high level of care, including serious medications, for that pain. The court is aware of no medical opinion or medical record in this

administrative record establishing that Ms. Eastman is capable of sitting for 6 hours in an 8-hour workday, standing for 6 hours in an 8-hour workday, or that she can occasionally stoop, kneel, crouch, and crawl.  AR19.

The ALJ's RFC opinion is its and its alone to make.  But it must be based on *some* medical evidence.  Here, the medical records are consistent, or at least not inconsistent, with Ms. Eastman's own description of her ability to function and her husband's testimony is corroborating.  The ALJ rejected the consulting physicians' physical RFC opinions.  This court is at a loss to determine what medical evidence supported the ALJ's physical RFC decision.  The only records the ALJ points to—full extremity strength and no problems with hips or thoracic spine—are really beside the point.  Those observations are completely consistent with reports of disabling pain in one's neck, lumbar spine and left knee.  The court will remand for the ALJ to reevaluate the evidence of Ms. Eastman's physical functional capabilities and to order a consultative exam or otherwise further develop the record should the ALJ find that to be provident.

Ms. Eastman also asserts the ALJ erred because it failed to address whether she had any functional limitations from her thyroid cancer, left trapezious strain, and cellulitis.  The Commissioner counters that the fact the ALJ did not assign any functional limitations to these conditions means the ALJ found affirmatively that they did not impair Ms. Eastman's function.  The truth is, the court would have to guess because the ALJ never addressed the issue.  Although the ALJ found these three conditions to be non-severe

77

impairments, they are not addressed in the RFC formulation.  Upon remand, the ALJ should clarify whether it finds any functional limitations are imposed by any of these conditions.

### 3.    Mental RFC

Ms. Eastman's two primary arguments for error in the ALJ's formulation of her mental RFC are:  (1) the ALJ did not appear to take into account functional limitations from her intellectual disability and (2) although the ALJ facially credited the opinions of the state agency psychological consultants, it did not factor their opinions into mental RFC and, in fact, concluded Ms. Eastman could perform a job that was at odds with those consultants' medical opinions.

### a.    Intellectual Disability

The ALJ appears to have rejected any intellectual disability when formulating Ms. Eastman's mental RFC.  As with the step three Listing analysis, the ALJ erroneously relied upon Ms. Eastman's full scale IQ score of 64 instead of her lower verbal IQ score of 54.  Compare AR25, with AR432.  See Listing § 12.00D(6)(c) (the Commissioner uses the lowest of the several IQ scores).  The ALJ noted Ms. Eastman had been in special education classes from elementary school through high school, but seemingly rejected this evidence as "remote."  AR25.

Because there was no specific diagnosis and because the IQ test was administered for school purposes, the ALJ accorded "little weight" to the school psychologist's opinion that Ms. Eastman's intellectual functioning was overall

deficient with significantly lower verbal scores suggesting a communication handicap.  Id.  This was double-error.  The Commissioner specifically recognizes school psychologists as acceptable medical sources for purposes of IQ tests.  See 20 C.F.R. §§ 416.902(a)(1) & (2)(ii).  Also, the Commissioner specifically rejects the necessity of a diagnosis for purposes of proving an intellectual disability.  20 C.F.R. § 416.921; and Listing §§ 12.00D(1)(a) & (b), and 12.05.

In addition, the Eighth Circuit has recognized that, in the absence of specific evidence to the contrary, one's intellectual function does not get better as one ages.  Lott, 772 F.3d at 550; Maresh, 438 F.3d at 900.  If Ms. Eastman was intellectually impaired at age 11, and impaired to a similar degree at age 16, it is unlikely she suddenly got better intellectually at some later age— absent evidence to the contrary.  There was no basis upon which to find the age-16 IQ test invalid because it was "remote" absent more recent evidence that undermined the earlier test.

In this vein, the ALJ also rejected Ms. Eastman's school psychologists' records because they were "not consistent with her work and tasks as an adult."  Again, absent evidence to the contrary, the Eighth Circuit generally holds that one's intellectual functioning does not improve with age.  Moreover, the regulations require that the intellectual disability be proven to exist *prior to* age 22.  See Listings §§ 12.00 & 12.05.  Therefore, if a claimant's 22nd birthday is "remote," it will necessarily require "remote" records to demonstrate the claimant's intellectual functioning prior to reaching that birthday.

79

And even if the ALJ suspected the age-16 IQ score was invalid, or that Ms. Eastman, against all odds, did in fact get better intellectually as she aged, the ALJ should have developed the record by ordering a consultative exam for another IQ test. <u>McCoy v. Astrue</u>, 648 F.3d 605, 612 (8th Cir. 2011); <u>Johnson</u>, 627 F.3d at 319-20; <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th 2004) (ALJ has a duty to develop the record even when claimant has counsel).

When Ms. Eastman reported for counseling for her anxiety/PTSD condition, the psychologist, Tony Sorenson, meeting Ms. Eastman for the first time, interviewed her and recorded that her intelligence "is estimated to be average." AR1112. The ALJ noted this fact in rejecting any functional limitations from Ms. Eastman's intellectual disability. AR21. However, a casual observation based upon conversing with a patient upon a first-time meeting does not "trump" a valid Wechsler IQ test administered by a psychologist for the express purpose of evaluating the patient's intellectual functioning. A casual estimate that one's patient is of average intelligence, especially when the focus of the consultation is depression and anxiety rather than intellectual disability, is not substantial evidence to support a conclusion that there is no intellectual disability in this case, even if that casual observation is (also) made by a psychologist.

Furthermore, when the subject was discussed of Ms. Eastman wanting to confront the physician who nicked her uterus in the D & C procedure, Ms. Eastman told Dr. Sorenson she had been in special education classes, was unable to write, and unable to organize her thoughts sufficient to compose a

80

letter.  AR1078.  Dr. Sorenson offered to write Ms. Eastman's thoughts down and have them transcribed for her.  Id.  It is notable that, after his first visit with Ms. Eastman, Dr. Sorenson never again described Ms. Eastman as having "average intelligence."

The same analysis applies to Certified Nurse Practitioner Laura Withorne-Maloney's very brief notation of "average intelligence."  AR1039.  Ms. Eastman was seeing Maloney for a medication recheck for her depression and anxiety, not for assessment of her intellectual functioning.  AR1036-41.  CNP Maloney did not administer the Wechsler IQ test or any other intelligence test.  Id.  Finally, CNP Maloney is not an "accepted medical source" for claims filed prior to March 27, 2017.  See 20 C.F.R. § 416.902(a).

"The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).  Furthermore, when an opinion is rendered by a specialist about medical issues related to his or her area of specialty, the Commissioner directs that more weight be accorded that opinion.  See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).  Here, the casual observations of a psychologist who was not treating Ms. Eastman for intellectual disability and who did not administer any IQ testing, cannot trump the school psychologist's evidence.  The school psychologist was acting within

81

the field of her expertise, was evaluating Ms. Eastman specifically to determine intellectual disability, and administered specific, objective tests to quantify that impairment.

Finally, the ALJ termed Ms. Eastman's intellectual disability a "non-medically determinable impairment," (AR16), a conclusion this court found to be error, *supra*. Because only medically determinable impairments are to be considered when formulating RFC, the ALJ's characterization of the condition as a "non-medically determinable impairment" supports this court's conclusion that the ALJ did not consider Ms. Eastman's intellectual disability when formulating her RFC. See SSR 96-8a; 20 C.F.R. 416.945(a)(2). Because Ms. Eastman's intellectual disability *was* a medically determinable impairment, the ALJ should have considered that impairment at step four.

### b.    State Agency Psychological Consultants' Opinions

Psychologists Stephanie Fuller, Ph.D., and Jerry Buchkoski, Ph.D., rendered non-examining, non-treating opinions based upon a review of records only. AR24. They concluded Ms. Eastman could, among other things, carry out two-step instructions on a consistent basis. Id. The ALJ gave these opinions "considerable weight." Id. While most of the functional opinions from these two psychologists were incorporated into Ms. Eastman's mental RFC, the ALJ did not incorporate the two-step-instruction opinion. Compare AR24, with

AR19.  Instead, the ALJ substituted its own opinion that Ms. Eastman could perform "simple tasks."[14]  AR19.

Significantly, neither of these consulting psychologists had the benefit of reviewing Ms. Eastman's education records, including her IQ test scores, her individual education program, her history of enrollment in special education classes, her inability to pass high school exit exams unaided, and the school psychologist's report.  Compare AR243-44, 256-58 (describing records reviewed by Fuller and Buchowski in 2014), with AR430-37 (school records certified and received by the Commissioner in May, 2016).

While two-step-instructions and "simple tasks" might seem congruent or analogous, Ms. Eastman argues it was error because the ALJ ultimately determined she could return to her past work as a mail processing clerk, Dictionary of Occupational Titles (DOT) #209.687-026.  The job of "mail processing clerk" requires more than two-step instructions asserts Ms. Eastman.

The DOT describes "reasoning level 1" jobs as those jobs which are limited to carrying out simple one- or two-step instructions.  See https://occupationalinfo.org/appendxc_1.html, last checked July 27, 2018.

---

[14] In rejecting Ms. Eastman's intellectual disability as a severe impairment at step two, the ALJ characterized its mental RFC as the ability to perform "very simple unskilled work.  AR17.  However, in actually describing Ms. Eastman's RFC, the ALJ described it as the ability to perform "simple tasks," not "very simple."  AR19.  It is the characterization of the RFC which controls.

The job of mail processing clerk requires "reasoning level 3," a level that is two increments higher than the level at which the state agency psychologists said Ms. Eastman could perform and it requires intellectual ability in excess of the ability to simply follow one- or two-step instructions.  See https://occupationalinfo.org/20/209687026.html, last checked July 27, 2018 (describing mail clerk job as requiring "GED: R3").

Instead, level 3 requires an employee to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "deal with problems involving several concrete variables in or from standardized situations."  See https://occupationalinfo.org/appendxc_1.html, last checked July 27, 2018. The language development for a level 3 job requires the employee to be capable of reading "a variety of novels, magazines, atlases, and encyclopedias" as well as "safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work." Id.  The math required for a level 3 job requires an employee to "compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage" as well as "calculate surfaces, volumes, weights, and measures." Id.

There is no support in the record for the conclusion by the ALJ that Ms. Eastman is capable of performing a job requiring reasoning at a level 3 under the DOT.  The Commissioner argues before this court that the ALJ gave the opinions of the consulting psychologists "considerable," but not

84

"controlling" weight.  The Commissioner adds that the ALJ was not required to "parrot" the psychologists' opinions.  Those are accurate observations.  But the observations do not further this court's inquiry as to how the ALJ concluded Ms. Eastman could perform a job at reasoning level 3.

In an attempt to shore up the ALJ's conclusion that Ms. Eastman could return to her old job, the Commissioner asserts Ms. Eastman "worked as a Mail Clerk, an unskilled job with [reasoning level 3], for *many years* for the U.S. Post Office with no showing of a decline in her functioning after she left this job."  See Docket No. 16 at p. 26 (emphasis supplied).  This argument misstates the record.  Ms. Eastman worked for the Post Office for approximately 12 to 18 months, not for "many years."  AR207-08, 348. Furthermore, she experienced significant difficulties with the intellectual demands of the job, a shortcoming her supervisor brought home to her in monthly "job talks" in which he told Ms. Eastman her inability to memorize zip codes was a "huge problem." AR208, 231-32.  Ms. Eastman eventually left this job in part due to the stress of not being able to master the intellectual demands of the job.  Id.

The Commissioner also relies on Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010), for the proposition that "simple" is the same as "two-step instructions" when describing a claimant's capabilities.  The Moore case does not stand for that proposition.  In Moore, the discrepancy was between the hypothetical posed by the ALJ and the jobs identified as doable by the claimant by the VE. Id. at 604.  While the ALJ had stated in the hypothetical that the individual

85

was "capable of 'carrying out simple job instructions' and performing 'simple, routine and repetitive work,' " the VE identified jobs at the Level 2 reasoning level described by the DOT.  Id.  The court held that Level 2 reasoning was consistent with the hypothetical.  Id.  As discussed above, it is *Level 1* that is limited to one- or two-step instructions, not Level 2.  Therefore, Moore does not stand for the proposition that Level 1 (one- or two-step instructions) is equal to "simple" work.

The Commissioner is correct when she asserts it is Ms. Eastman's burden, not the ALJ's burden, to demonstrate at step four that she is *in*capable of returning to her former work as a mail clerk.  The court finds she has carried that burden and substantial evidence in the record does not support the ALJ's contrary conclusion.

Ms. Eastman also argues that, while the ALJ properly considered functional limitations resulting from her affective disorder and anxiety disorder, she asserts the ALJ failed to address functional limitations resulting from her diagnosed post-traumatic stress disorder and panic disorder.  The Commissioner suggests those diagnoses and labels are overlapping and describe the same set of symptoms, symptoms for which the ALJ accounted when formulating mental RFC.  The court is recommending remanding this matter for errors in connection with Ms. Eastman's intellectual disability at several steps in the sequential analysis.  The court will direct that, upon remand, the ALJ clarify its position as to the issue whether these four

diagnoses are overlapping and whether they concern the same sets of symptoms and functional limitations.

**H.    Whether the Commissioner Erred by Relying on Vocational Evidence that was not Supported by Substantial Evidence?**

For her final assignment of error, Ms. Eastman asserts the ALJ erred in relying on the opinion of the vocational expert to arrive at the conclusion Ms. Eastman could return to her former job as a mail clerk.  The Commissioner argues the ALJ was entitled to rely on this expert opinion and should not be reversed on this basis.

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."  Howard v. Massanari, 255 F.3d 577, 581-82 (8th Cir. 2001) (quoting Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996)). "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (quoting Cox, 495 F.3d at 620).  "However, '[w]hile the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments."  Howard, 255 F.3d at 582 (quoting Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996)).  In Howard, the court held the hypothetical stating Howard could perform simple, repetitive, routine tasks adequately captured the state agency psychologist's

opinion that Howard often had deficiencies of concentration, persistence or pace, but was able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function.  Id.

The Howard decision is distinguishable.  While the ALJ in Howard shortened and summarized some of the psychologist's opinion, here, the ALJ's hypothetical *changed* the psychologists' opinion from a very specific "one- or two-step instructions" to "simple tasks," ultimately resulting in the conclusion Ms. Eastman could perform a job far above her intellectual capabilities demonstrated in the record.  In addition, the hypothetical described a worker with a "high school education" (AR234) without mentioning the claimant's substantive high school (and elementary) classes were all special education classes and that the claimant was unable to pass the high school exit exams without (1) unlimited time and (2) substantive assistance from a third party. The hypothetical made no mention of Ms. Eastman's IQ scores nor did it attempt to describe the impact of her intellectual disability on her ability to perform work.  The hypothetical did not accurately describe Ms. Eastman in several material respects.  This issue, too, requires remand for reconsideration.

## I.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Eastman requests reversal of the Commissioner's decision with remand and instructions for an

award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the

proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be readdressed and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that the Commissioner's decision should be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 7, 2018.          BY THE COURT:

                               VERONICA L. DUFFY
                               United States Magistrate Judge